2005-NMSC-036

123 P.3d 754

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Phillip David LOPEZ, Defendant–
Appellant.**

**No. 28,483.**

Supreme Court of New Mexico.

Oct. 14, 2005.

John Bigelow, Chief Public Defender, Karl Erich Martell, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

Patricia A. Madrid, Attorney General, Martha Anne Kelly, Assistant Attorney General, Albuquerque, NM, for Appellee.

## OPINION

MINZNER, Justice.

{1} Defendant appeals from a judgment and sentence entered following a jury trial and a bench trial. Defendant was convicted on a total of seven counts, of which six were by the jury and the other by the trial judge. The jury convicted him on six counts: robbery, contrary to NMSA 1978, § 30–16–2 (1973); burglary, contrary to NMSA 1978, § 30–16–3 (1971); felony murder, contrary to NMSA 1978, § 30–2–1(A)(2) (1994); conspiracy to commit first degree (felony) murder and conspiracy to commit robbery, contrary to NMSA 1978, § 30–28–2 (1979); and tampering with evidence, contrary to NMSA 1978, § 30–22–5 (1963, prior to 2003 amendment). The court convicted him of the seventh count: possession of a firearm by a felon, contrary to NMSA 1978, § 30–7–16 (1987, prior to 2001 amendment). The Court aggravated the sentence for conspiracy to commit first degree murder by one-third. *See* NMSA 1978, § 31–18–15.1 (1993). We have jurisdiction pursuant to Article VI, Section 2 of the New Mexico Constitution and Rule 12–102(A)(1) NMRA 2005.

{2} Defendant has made two arguments on appeal. Defendant contends that the Sixth Amendment to the United States Constitution, which guarantees his right to a trial by jury, precludes the aggravation of his sentence for conspiracy to commit first degree murder. Defendant also argues that there was insufficient evidence to support some of his convictions. Relying on *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), he argued that in aggravating his sentence for conspiracy pursuant to Section 31–18–15.1, the trial court exceeded its authority, because under the Sixth Amendment the maximum sentence a judge may impose is "the maximum he may impose *without* any additional findings." *Id.* at 2537. Defendant argued that the "aggravating circumstances surrounding the offense or concerning the offender" to which Section 31–18–15.1 refers are "additional findings" under *Blakely* and that a jury rather than a judge must determine whether the State has proved the necessary facts to support these findings beyond a reasonable doubt.

{3} After Defendant's appeal was submitted, following oral argument, the Court of Appeals held Section 31–18–15.1 unconstitutional in reliance on *Blakely*. *See State v. Frawley*, 2005–NMCA–017, 137 N.M. 18, 106 P.3d 580, *cert. granted*, 2005–NMCERT–002, 137 N.M. 266, 110 P.3d 74. While his appeal was pending, the United States Supreme Court decided *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). In *Booker*, the United States Supreme Court concluded that the federal sentencing guidelines violated the Sixth Amendment. A majority of the Court concluded that the Sixth Amendment as construed in *Blakely* required that result. 125 S.Ct. at

755–56. In adopting a remedy, however, a different majority of the Court decided that only a portion of the guidelines needed to be severed and excised. *Id.* at 756–57. So modified, the Court construed them as advisory, requiring a sentencing court to "take them into account when sentencing." *Id.* at 767. We scheduled additional oral argument in order to consider the combined effect of *Booker* and *Blakely.* We now affirm.

## I

{4} Defendant and Ed Sedler worked at a Salvation Army location in Albuquerque. On Saturday, September 7, 1996, they borrowed a pickup truck from co-workers and went camping. The victim, Gilbert Bruce Stark, was over 70 years old and lived alone at his rural residence in Catron County, New Mexico. Sedler knew him. On Monday, September 9, Defendant and Sedler visited Stark, as they had done a day or two earlier. On the 9th, however, they intended to rob him. According to Defendant's statement Sedler broke Stark's neck and removed five hundred dollars from his pockets, splitting the money with Defendant. Then the two took Stark to a well on his property and threw him into it. Sedler and Defendant covered the well, replaced the lid, and locked it.

{5} The well was about 20 feet deep and three or four feet in diameter. A pipe extended about two feet above and below the bottom of the well, in roughly the center. The pipe was capped with a tin can. A ladder ran from the bottom of the well to the ground surface. Stark had stacked lumber over the opening to the well, enclosed the well in a box, chained the lid shut, and locked it with a padlock.

{6} Defendant and Sedler then entered Stark's residence and took two pistols and at least three long firearms. After driving away from the residence, they stopped and Defendant threw the long firearms into the woods a few miles from the residence. Either that night or the night of the 10th they returned to Albuquerque. On September 11 Sedler sold one of the pistols at a pawnshop. Defendant traded the other pistol for crack. The men were supposed to have returned the borrowed pickup truck on Sunday the 8th.

When they did not, the truck was reported as embezzled. Later that week the truck was found undamaged in a church parking lot, and the police did not pursue a charge of embezzlement.

{7} On Wednesday, September 11, Robert Nelson, a neighbor and retired law enforcement officer, stopped by Stark's residence. He became alarmed when he saw Stark's Leatherman tool, a spotting scope, and numerous beer cans on the ground. Nelson looked for Stark that day, and he eventually asked another neighbor for help, who found Stark's broken glasses on the ground. Nelson contacted the State Police but continued his search. The State Police contacted Stark's family, and on Wednesday, September 11, Nelson and Stark's son found him dead at the bottom of the well. The box over the well was chained and locked from the outside, and planks of wood covered the well.

{8} Dr. Patricia McFeely conducted an autopsy and later testified at trial. She stated that the cause of death was blunt trauma to the chest, abdomen, and extremities, with thickening of the arteries as a contributing factor. Stark's neck was not broken. He had three broken ribs, a broken hip, an eight-inch cut on his hip, lacerations and bruising to his head, and a number of other bruises and abrasions. McFeely stated that Stark was alive when these injuries were inflicted because bruising and bleeding around the injuries indicated that blood circulated after infliction.

{9} McFeely said that the head injuries were consistent with striking by a blunt object, such as a fist or spotting telescope, but were not fatal. She said that the hip injuries and broken ribs were consistent with being thrown down the well and landing on the pipe topped with a can. When Stark was found, his left hip was adjacent to the pipe and can. Although she could not be precise, McFeely stated that he had likely been dead for a couple or several days before being found. Thus, he might have been alive in the well, and he might have survived his injuries had he received prompt care. In sum, Stark's injuries were consistent with the State's theory at trial that Sedler and Defen-

dant inflicted the head wounds, threw Stark into the well while alive, that the wounds to the hip and ribs occurred when he fell, and that he survived for some time in the well.

{10} McFeely could not rule out several other possibilities. Stark might have died before he was thrown into the well, and all of the injuries might have been inflicted before he was thrown into the well. The spotting scope could have inflicted the cut to the hip, and something other than the fall down the well could have caused the hip fracture. Stark had a history of heart disease, and narrowing of the arteries was a contributing factor in his death. He could have suffered a heart attack, because if he died within an hour of such an attack there would be no discernable evidence of damage to the heart. A heart attack could have occurred before or after he was thrown into the well, although the observable injuries had to have been inflicted before the heart attack because there was bleeding and bruising around the injuries.

{11} The criminal investigation stalled until the spring of 1999, when the case was assigned to an inter-departmental unit that investigated old, unsolved crimes. Stark had kept a list of his firearms, including the serial numbers. Using this list, Jeff Campbell of the Attorney General's Office determined that Sedler had sold one of the firearms at a pawnshop in Albuquerque on September 11, 1996. Campbell contacted the police in Albuquerque, who informed him that Sedler and Defendant appeared on a report about the embezzled pickup truck. Campbell brought Defendant to the Valencia County Sheriff's Office for questioning. Campbell made a recording of the interrogation, which was later introduced into evidence.

{12} The recording begins with Campbell questioning Defendant after advising him of his rights. Campbell's questions focused on Defendant's involvement in embezzling the pickup truck. Defendant was evasive, and he accused Campbell of tricking him. Defendant repeatedly denied any knowledge or recollection of the stolen vehicle or his employment by the Salvation Army in Albuquerque.

{13} The interview continued as Sargent Kindig of the State Police took over the questioning and Campbell observed. Kindig insisted that Defendant had worked at the Salvation Army and had borrowed the truck with Sedler. Kindig told Defendant that his fingerprints were found at the crime scene, although that was not true. Kindig repeatedly stated or implied that he thought Defendant was scared for his own life and that Sedler committed the murder. Kindig told Defendant that Sedler had made a statement, placing the blame on Defendant, but that he thought Sedler was lying.

{14} Defendant indicated that he had relevant information. For example, he said, "He's the murderer," meaning Sedler. At another point he said, "Ya, he killed that old man. He broke his fucking neck. It was over crack cocaine." Defendant attempted to bargain with Kindig, seeking assurance that he was only a witness and that he would not be charged. He stated repeatedly that Kindig needed Defendant's help and that he wanted help and assurance in return. Kindig continued to assert that Defendant was present, that Sedler had blamed Defendant, and that Kindig did not believe Sedler. Kindig repeatedly said that Defendant had a choice to make, that is, to make a statement, or Kindig would go to the prosecutor with the information Sedler had provided.

{15} Eventually, Defendant said, referring to Sedler, that "he got the old man by the neck and broke his neck." He then provided a narrative of events. Defendant and Sedler borrowed the pickup truck and went camping in Catron County. They went back to Albuquerque to use crack cocaine. Returning to the mountains, Sedler had the idea to borrow money from Stark or sell the spotting scope to him. Sedler then suggested robbing him, to which Defendant replied, "Fuck it, let's go for it." When they arrived at Stark's residence, Sedler grabbed him by the neck, took him down, twisted his neck and broke it. Defendant, scared for his own life, then asked Sedler, "Is it my turn," meaning "my turn to be killed." Sedler responded, "Are you going to help me or not?" In response, Defendant assisted Sedler in dragging Stark and throwing him into the well.

{16} In response to Kindig's questions to clarify details, Defendant said that Sedler took five hundred dollars from Stark's pocket before throwing him into the well. Defendant and Sedler split the money. Defendant also admitted taking two pistols, one of which he traded for crack, and some long firearms from Stark's residence, which he threw in the woods. Kindig began reviewing Defendant's story, again asking for details. Defendant reiterated the story: their visit to the victim's residence before the day of the murder; Sedler's idea to rob the victim; Sedler's murder of the victim; their "ransacking" of the victim's residence and taking of the firearms; Sedler's removal of the five hundred dollars from the victim's pocket; and Defendant's disposal of the long firearms in the woods. Defendant maintained that Stark was dead when he was thrown into the well. Throughout the interview, Defendant maintained that he did not kill Stark, that he was scared for his own life, and that he wanted to take a lie detector test and wanted Sedler to do so as well.

{17} After his confession, Defendant led law enforcement to the place where he had discarded the long firearms. At least two long firearms were recovered in the woods. The pistol which Defendant said he traded for crack had been previously recovered from an apartment where police suspected drugs were used or sold.

{18} Defendant was charged on an open count of murder, and the jury was instructed on first degree deliberate murder as well as felony murder. He was acquitted of first degree deliberate murder but was convicted of felony murder and the other counts with which he was charged. The district court sentenced Defendant to life imprisonment for felony murder, to fifteen years for conspiracy to commit first degree (felony) murder, to nine years for robbery, to three years for conspiracy to commit robbery, to eighteen months for tampering with evidence, to three years for burglary, and to eighteen months as a felon in possession. The court aggravated the sentence for conspiracy to commit murder, ordered the sentences for felony murder and conspiracy to commit murder to run consecutively, and ran the other sentences concurrently with the sentences for felony murder and conspiracy. *See* NMSA 1978, § 31–18–15 (1994, prior to 1999 amendment); § 31–18–15.1. On appeal, we first address Defendant's claim that there was insufficient evidence to support his convictions.

## II

{19} In his briefs, Defendant has set forth the underlying facts and the standard of review but he has not "identified with particularity the fact or facts which are not supported by substantial evidence," contrary to Rule 12–213(A)(4) NMRA 2005. We are not persuaded that Defendant intended to waive his claim that there was insufficient evidence to support his convictions nor that we should refuse to consider it. Under *Blakely*, "the facts reflected in the jury verdict or admitted by the defendant" are relevant in identifying the sentence the judge may impose "*without* any additional findings." 124 S.Ct. at 2537. We conclude we should review the evidence not only in response to Defendant's claim there was insufficient evidence but also to address fully Defendant's Sixth Amendment argument.

{20} The standard of review for sufficiency of evidence claims requires us to "view all of the evidence in the light most favorable to support the jury's verdict," and to "determine whether any rational jury could find all elements of the crime based on the facts presented at trial." *State v. Montoya*, 2003–NMSC–004, ¶ 26, 133 N.M. 84, 61 P.3d 793. Defendant conceded he committed several offenses, and we believe the evidence supports the concessions he made at trial.

{21} Defendant conceded in his opening and closing statement to the jury that he was guilty of conspiracy to commit robbery. He also conceded that he had committed the crimes of robbery, burglary, and tampering with evidence, but he contended that he should be acquitted of these charges because he did so under fear that Sedler would assault or kill him. The charges which Defendant vigorously defended were first degree murder and conspiracy to commit first degree murder. He contended that Sedler killed the victim without Defendant's assistance or agreement and that Stark was dead

when he helped Sedler throw him into the well.

**{22}** In response to Sedler's idea to rob Stark, Defendant admitted he agreed. There was evidence that Defendant or Sedler or both assaulted Stark and split the money taken from the victim. This is sufficient evidence for the convictions of robbery, as principal or as an accessory, and for conspiracy to commit the robbery. *See* §§ 30–16–2; 30–28–2. Defendant also admitted that he and Sedler "ransacked" the residence and removed at least two pistols and three long firearms. This is sufficient evidence for the conviction of burglary. *See* § 30–16–3. Finally, Defendant admitted that he assisted Sedler in throwing Stark into the well and that he threw the long firearms into the woods. The jury could infer that he committed these acts to avoid apprehension. This is sufficient evidence for the conviction of tampering with evidence. *See* § 30–22–5.

**{23}** For the conviction of felony murder, the State presented alternative theories: Defendant committed the crime of [r]obbery "under circumstances or in a manner dangerous to human life" and caused the death "during the commission of the robbery;" or Defendant was an accessory to such a robbery and "helped[,] encouraged[,] or caused the killing to be committed." Conviction of felony murder in New Mexico requires proof that a "defendant intended to kill, knew that his actions created a strong probability of death or great bodily harm . . . or acted in a manner greatly dangerous to the lives of others." *State v. Griffin*, 116 N.M. 689, 695, 866 P.2d 1156, 1162 (1993). In this case, the jury was instructed by the State that under either theory it needed to find Defendant "intended the killing to occur or knew that he was helping to create a strong probability of death or great bodily harm."

**{24}** Dr. McFeely testified that Stark sustained injuries from some combination of injuries sustained during the robbery and after being thrown into the well and that these injuries were the cause of death. The jury might have found Stark was alive when he was thrown into the well, that Defendant knew Stark was alive, and that in helping Sedler throw Stark into the well Defendant knew he helped create a strong probability of death or great bodily harm. We do not address the sufficiency of the evidence to support the State's theory that Defendant was liable as a principal. That theory would have required the jury to find that Defendant committed the robbery in a manner that was inherently or foreseeably dangerous to human life. *See State v. Duffy*, 1998–NMSC–014, ¶¶ 27–28, 126 N.M. 132, 967 P.2d 807. We do not address the sufficiency of the evidence to support that theory, because "due process does not require a general verdict of guilt to be set aside so long as *one of the two* alternative bases for conviction is supported by sufficient evidence." *State v. Salazar*, 1997–NMSC–044, ¶ 43, 123 N.M. 778, 945 P.2d 996.

**{25}** For the crime of conspiracy to commit first degree murder, the jury was instructed that the State had to prove Defendant agreed with another person, by words or acts, to commit first degree murder and that he and the other person intended to commit first degree murder. *See* § 30–28–2(A); UJI 14–2810 NMRA 2005. The jury's verdict specifically found Defendant guilty of first degree (felony) murder. The jury's verdict requires evidence of an agreement as well as of intent to commit felony murder. We are not certain that evidence sufficient to support a felony murder conviction when more than one offender is involved necessarily will be sufficient to support a conviction of conspiracy to commit felony murder. *Cf. State v. Nieto*, 2000–NMSC–031, ¶¶ 28–29, 129 N.M. 688, 12 P.3d 442 (affirming convictions of felony murder and conspiracy to commit first degree murder based on the same evidence). *See generally* 2 Wayne R. LaFave, *Substantive Criminal Law* § 12.2(c)(2), at 278 (2d ed.2003) (arguing "that there is no such thing as a conspiracy to commit a crime which is defined in terms of recklessly or negligently causing a result"). In this case, there was evidence from which the jury was entitled to infer that Defendant and Sedler formed the requisite intent to kill Stark during the robbery and that they threw him into the well while he

was alive. The evidence that they carefully, deliberately, even painstakingly first opened, then covered, and finally re-sealed the well supports an inference that they reached an agreement to kill Stark in the course of the robbery and that both intended his death. We conclude the evidence in this case supports the jury's verdict.

{26} At oral argument, Defendant noted that we have said "a conviction under a general verdict must be reversed if one of the alternative bases of conviction is legally inadequate." *State v. Olguin,* 120 N.M. 740, 741, 906 P.2d 731, 732 (1995). We are not persuaded that this principle requires us to decide whether conspiracy to commit felony murder requires proof of intent to kill. *Cf. State v. Foster,* 1999–NMSC–007, ¶ 27, 126 N.M. 646, 974 P.2d 140 (discussing the principle in the context of an alternative basis that would violate the constitutional protection against double jeopardy). The application of this principle was not raised at trial, *see Olguin,* 120 N.M. at 742, 906 P.2d at 733 (Ransom, J., dissenting), and Defendant has not argued that the doctrine of fundamental error applies.

{27} For the crime of felon in possession of a firearm, the State had to prove that Defendant had been previously convicted of a felony and he possessed a firearm within ten years of completing his sentence for the prior felony conviction. Section 30–7–16; UJI 14–701 NMRA 2005. At the bench trial the parties stipulated to admission of all evidence admitted in the jury trial, including Defendant's statement to police in which he admitted possessing a firearm. The primary issues at the bench trial were whether Defendant had a prior felony conviction and whether he had completed his sentence less than ten years earlier. The State contended that Defendant was convicted in 1988 and that his sentence of probation continued until 1991. The State submitted documentary evidence that Defendant was convicted of burglary in San Juan County in CR–86–0383–3. Two documents, the criminal information and the criminal complaint, listed his birth date and social security number. Another document, the repeat offender plea agreement and disposition agreement,

listed his birth date, but a different social security number. The guilty plea and the judgment and sentence did not list either his birth date or social security number, but they did list his name and the same case number. The judgment and sentence was filed on November 3, 1988, and provided for three years probation.

{28} Based primarily on the documentary evidence, the court concluded that the State had satisfied its burden of proof and found Defendant guilty of possession of a firearm by a felon. The documentary evidence of a prior felony conviction and Defendant's numerous statements during the interrogation that he possessed several of Stark's firearms is sufficient evidence for the conviction of felon in possession of a firearm.

## III

{29} We now turn to Defendant's Sixth Amendment argument. Defendant did not make this argument at trial or sentencing, but both *Booker* and *Blakely* were decided after he was tried and sentenced. The same issue arises in other cases now pending before us. Defendant raises the same issue that arises in *Frawley.* We apply new rulings in criminal cases to all cases on direct review. *See Duffy,* 1998–NMSC–014, ¶ 26, 126 N.M. 132, 967 P.2d 807. We conclude Defendant is entitled to consideration of his Sixth Amendment issue on direct appeal. *See Lopez v. People,* 113 P.3d 713, 716 (Colo. 2005) (noting that *Booker* applied its holdings to all cases on direct review).

{30} We begin to consider whether Defendant's sentence under Section 31–18–15.1 is consistent with the Sixth Amendment by quoting or summarizing relevant portions of the statutes and reviewing our analysis of the effect of the Sixth Amendment on our statutory scheme prior to *Frawley.* We then examine the significance of *Blakely* and *Booker* to our statutory scheme and analyze its effect on our scheme. Finally, we discuss the sentencing hearing in this case.

## A

{31} The New Mexico Criminal Sentencing Act provides a "basic sentence" for all non-

capital felonies. NMSA 1978, § 31–18–15 (2003). The Legislature has provided that "[t]he appropriate basic sentence of imprisonment shall be imposed upon a person convicted *and sentenced pursuant to Subsection A of this section, unless the court alters* the sentence pursuant to the provisions of"[1] one or more of four statutes. *Id.* § 31–18–15(B) (emphasis added). One of the four is the statute at issue in this appeal, Section 31–18–15.1, which provides

A. The court shall hold a sentencing hearing to determine if mitigating or aggravating circumstances exist and take whatever evidence or statements it deems will aid it in reaching a decision. The court may alter the basic sentence as prescribed in Section 31–18–15 NMSA 1978 upon a finding by the judge of any mitigating or aggravating circumstances surrounding the offense or concerning the offender. If the court determines to alter the basic sentence, it shall issue a brief statement of reasons for the alteration and incorporate that statement in the record of the case.

B. The judge shall not consider the use of a firearm or prior felony convictions as aggravating circumstances for the purpose of altering the basic sentence.

C. The amount of the alteration of the basic sentence for noncapital felonies shall be determined by the judge. However, in no case shall the alteration exceed one-third of the basic sentence; provided, that when the offender is a serious youthful offender or a youthful offender, the judge may reduce the sentence by more than one-third of the basic sentence.

{32} Another statute requires an increase in the basic sentence when a separate finding of fact shows that the defendant used a firearm while committing the crime. NMSA 1978, § 31–18–16 (1993). A third statute, NMSA 1978, § 31–18–16. 1 (1993), *repealed by* 2003 N.M. Laws, ch. 384, § 6, was replaced by the Hate Crimes Act, NMSA 1978, §§ 31–18B–1 to –5 (2003). Under that Act,

when a separate finding of fact shows beyond a reasonable doubt that the offender was "motivated by hate" as defined in Section 31–18B–2, the court may increase the basic sentence. Section 31–18B–3. A fourth statute requires an increase in the basic sentence on proof of the existence of a prior felony or felonies. *See* NMSA 1978, § 31–18–17 (1993, prior to 2002 amendment).

{33} In *Booker,* the United States Supreme Court stated that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." 125 S.Ct. at 756. In making this statement, the Court rephrased a prior holding that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). *Booker* noted that it "reaffirm[ed] our holding in *Apprendi.*" 125 S.Ct. at 756. In relying on these statements, Defendant contends, based on *Blakely,* that the statutory maximum is the basic sentence provided in Section 31–18–15. We reached a contrary conclusion in considering the effect of *Apprendi* on our sentencing scheme.

{34} Between *Apprendi* and *Booker,* our Court of Appeals considered Sections 31–18–15 and 31–18–15.1 in light of *Apprendi's* holding. In *State v. Wilson,* 2001–NMCA–032, ¶¶ 18–20, 130 N.M. 319, 24 P.3d 351, the Court of Appeals reviewed the history of sentencing in New Mexico. New Mexico enacted determinate sentencing in 1977, when the Legislature provided sentence ranges within which a trial court could set a definite term of imprisonment. In 1979, the Legislature enacted the current system, replacing the ranges with basic sentences and allowing an increase or decrease of up to one-third.

---

1. Prior to amendment in 2003, the italized portion read as follows: "of a first, second, third or fourth degree felony or a second or third degree felony resulting in the death of a human being, unless the court alters such." NMSA 1978,

§ 31–18–15–B (1994, prior to 2003 amendment). Because we do not believe the change in wording changed our analysis, we analyze the statute in its present form.

*Id.* ¶ 20. The Court of Appeals concluded that the authority of the sentencing court [had] not changed since "the 1977 amendment implemented determinate sentencing within a range of years and gave the trial court the authority to impose a sentence of a definite term of years within that range." *Id.* ¶ 21. Every defendant convicted of a noncapital felony faced a sentence within the applicable range, and the judge had broad discretion to sentence within the range. *Id.* ¶ 29.

{35} The defendant in *Wilson* argued that the "basic sentence" established by Section 31–18–15 established the "maximum sentence authorized" for purposes of *Apprendi*. *Id.* ¶ 13. The Court rejected that challenge, holding that New Mexico's sentencing statutes establish a range of sentences, and "the basic sentence[]" is the midpoint of each range. *Id.* ¶ 15. The Court observed that upon conviction, in every criminal case, without exception, the sentencing judge must hold a hearing to determine whether to decrease the defendant's sentence below the midpoint, or increase it above it, showing there was no right to the basic sentence. *Id.* ¶¶ 15, 29. "The outer limits of sentencing, without additional specific fact-finding, is the basic sentence plus a one-third increase under Section 31–18–15.1." *Id.* ¶ 16. This Court granted the defendant's petition, heard oral argument, but then quashed our writ. *See State v. Wilson*, 130 N.M. 459, 26 P.3d 103 (2001) (granting); *State v. Wilson*, 132 N.M. 484, 51 P.3d 527 (2001) (quashing).

## B

{36} Since *Wilson*, the Supreme Court has decided *Blakely* and *Booker*. Prior to *Booker*, the New Mexico Court of Appeals decided *Frawley*. The Court of Appeals concluded *Blakely* meant that *Wilson* "can no longer control or be considered controlling authority." *Frawley*, 2005–NMCA–017, ¶ 13, 137 N.M. 18, 106 P.3d 580. After *Booker*, we are not persuaded *Frawley* was correctly decided. *See People v. Black*, 35 Cal.4th 1238, 29 Cal.Rptr.3d 740, 113 P.3d 534 (2005) (upholding California's determinate sentencing scheme, which provides a presumptive term, a definite term above and a definite term below the presumptive term, and requires the sentencing judge to explain a sentence below or above the presumptive term).

{37} In *Blakely*, 124 S.Ct. at 2534–35, the Court reviewed the sentencing scheme in the State of Washington. Under that scheme, the defendant's plea to a second degree felony involving domestic violence and a firearm authorized a sentence within a range of 49 and 53 months. The court made a finding of fact of deliberate cruelty, which was a specifically enumerated factor that authorized an increased sentence of 90 months. Under Washington's sentencing scheme, a second degree felony was not subject to imprisonment exceeding ten years, and the State argued the relevant statutory maximum was ten years. *Id.* at 2537. The Supreme Court rejected the State's argument, stating

> [o]ur precedents make clear ... that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.* In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Id.* (citations omitted). The Court noted that "the jury's verdict alone does not authorize the sentence. The judge acquires that authority only upon finding some additional fact." *Id.* at 2538. The Court also noted that the judge could not have imposed the 90–month sentence on the basis of the plea. He would have been reversed had he done so. *Id.*

{38} Following *Blakely*, but prior to *Booker*, our Court of Appeals reconsidered Sections 31–18–15 and 31–18–15.1. *Frawley*, 2005–NMCA–017, ¶ 3, 137 N.M. 18, 106 P.3d 580. In *Frawley*, the defendant was convicted of two felonies for each of which the basic sentence was three years imprisonment. *Id.* ¶ 2. The district court increased the sentence for each felony by one year because the

defendant lacked remorse, there had been only a short interval between the two felonies and a prior similar offense, the victims and their families had experienced pain and fear, and the defendant fled to avoid prosecution. *Id.* The Court of Appeals determined that the district court made findings of fact and that the Court had increased the sentence on the basis of those facts pursuant to a statute that was indistinguishable from the statutes at issue in *Blakely. Frawley,* 2005–NMCA–017, ¶¶ 7, 14, 137 N.M. 18, 106 P.3d 580. The Court reasoned that in rejecting Washington's argument in *Blakely* that the relevant statutory maximum was ten years, the United States Supreme Court implicitly rejected the basis on which *Wilson* had rejected the defendant's argument based on *Apprendi. Frawley,* 2005–NMCA–017, ¶ 8, 137 N.M. 18, 106 P.3d 580. Defendant makes a similar argument in this case.

{39} In *Frawley,* the Court stated,

We read *Blakely* to say: When the jury considers the facts relevant to the elements of an offense in determining guilt or innocence, the criminal sanctions for that offense cannot be increased after the verdict based on facts the jury has not specifically considered in connection with its finding of guilt, whether or not the facts are labeled "sentencing factors," and even if the facts are not material to the statutory elements of the offense.

*Id.* ¶ 12. That reading limits the concept of a statutory maximum, consistent with the Supreme Court's rejection of Washington's argument in *Blakely,* but that reading seems contrary to another part of *Blakely,* which explicitly states:

Of course indeterminate schemes involve judicial factfinding, in that a judge (like a parole board) may implicitly rule on those facts he deems important to the exercise of his sentencing discretion.

124 S.Ct. at 2540. *Apprendi* also stated that, when sentencing offenders, it is permissible "for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment *within the range* prescribed by statute." *Apprendi,* 530 U.S. at 481, 120 S.Ct. 2348. Thus, *Blakely* appears to author-

ize some "judicial factfinding." Further, *Blakely* did not change the *Apprendi* rule that a court can punish within a range. *Blakely* prohibits punishing in excess of the punishment authorized by law as a consequence of the jury's verdict. 124 S.Ct. at 2537. The questions of what punishment a jury's verdict can be said to authorize and when a jury's verdict can be said to authorize punishment within a range as a judge may determine is appropriate are not easy to answer. *Compare State v. Gomez,* 163 S.W.3d 632, 661 (Tenn.2005) (upholding Tennessee's sentencing scheme under *Booker* by a split decision) *with Lopez,* 113 P.3d at 726 (upholding Colorado's sentencing scheme to the extent it is applied consistently with *Blakely* by an equally split decision).

{40} As *Wilson* recognized, Section 31–18–15.1 refers to "circumstances" rather than "facts," and imposes very few restrictions on what circumstances may be considered. *Wilson,* 2001–NMCA–032, ¶ 25, 130 N.M. 319, 24 P.3d 351. The statute requires a writing stating "reasons" rather than findings of fact. The purpose of the writing requirement is to ensure that the trial court did not consider impermissible circumstances, such as a defendant's exercise of the right to silence. *Cf. Black,* 29 Cal.Rptr.3d 740, 113 P.3d at 543–44 ("The judge's discretion to identify aggravating factors in a case is guided by the requirement that they be 'reasonably related to the decision being made.' ") (quoting California court rules). This safeguard, which is to protect criminal defendants, may not be analogous to the statutory requirements that *Apprendi* and *Blakely* indicated must be submitted to a jury, although the judge's reasons are characterized as "written findings" in *Wilson. See Wilson,* 2001–NMCA–032, ¶ 23, 130 N.M. 319, 24 P.3d 351. *Cf. Black,* 29 Cal.Rptr.3d 740, 113 P.3d at 536 (concluding that "the judicial factfinding that occurs when a judge exercises discretion to impose an upper term sentence or consecutive terms under California law does not implicate a defendant's Sixth Amendment right to a jury trial"). *Apprendi* indicates that the characterization given such determinations is not controlling, 530 U.S. at 492, 120 S.Ct. 2348, and that " 'the relevant inquiry is one not of

form, but of effect.' " *Black,* 29 Cal.Rptr.3d 740, 113 P.3d at 543 (quoting *Apprendi,* 530 U.S. at 494, 120 S.Ct. 2348). "Nothing in ... *Apprendi, Blakely,* or *Booker* suggests that they apply to factual determinations that do not serve as the 'functional equivalent' of an element of a crime." *Black,* 29 Cal.Rptr.3d 740, 113 P.3d at 549.

{41} *Frawley* indicates that judicial fact-finding is impermissible only if it results in "the criminal sanctions for that offense [being] increased after the verdict." 2005–NMCA–017, ¶ 12, 137 N.M. 18, 106 P.3d 580. *Frawley* persuasively reasons that the construction of the statutory scheme in Washington controlled *Blakely. Wilson* concluded that the legislative history of Sections 31–18–15 and 31–18–15.1 "strongly evinces a legislative intent that the two provisions be read together to prescribe a range of permissible sentences." 2001–NMCA–032, ¶ 17, 130 N.M. 319, 24 P.3d 351. *Frawley* did not hold that the statutory construction in *Wilson* was incorrect, but concluded that the Washington sentencing scheme considered by *Blakely* was "not significantly dissimilar" to New Mexico's. 2005–NMCA–017, ¶ 7, 137 N.M. 18, 106 P.3d 580. We think however, that the legislation *Blakely* considered is "significantly dissimilar" to the legislation at issue in this appeal.

{42} The California Supreme Court, like the Court of Appeals in *Frawley,* recognized that *Blakely* and *Booker* raise "questions about the permissible scope of judicial fact-finding under a variety of sentencing schemes." *Black,* 29 Cal.Rptr.3d 740, 113 P.3d at 542. The New Jersey Supreme Court recently observed that "many modern legislative sentencing schemes place a ceiling on the sentence that can be imposed based on the jury verdict alone, but allow for judicial factfinding to increase the sentence up to the maximum allowed by the statute. Such schemes appear to be in conflict with the Constitution." *State v. Natale,* 184 N.J. 458, 878 A.2d 724, 732 (2005) (footnote omitted) (listing in a footnote a number of jurisdictions in which the effect of *Blakely* and both *Blakely* and *Booker* on the state's sentencing scheme has been considered).

{43} The California Supreme Court, however, reached a different conclusion on the constitutionality of its sentencing scheme. In *Black,* the court distinguished the Washington scheme on the basis that the judge had limited discretion to sentence Blakely to the maximum sentence of ten years because the facts he had admitted in pleading guilty had been "taken into account in establishing the standard range." *Black,* 29 Cal.Rptr.3d 740, 113 P.3d at 541, 546. The court concluded the discretionary authority of a federal district court under the post-*Booker* federal guidelines were comparable to that provided under the California Penal Code to a trial judge.

> Because an aggravating factor under California law may include any factor that the judge reasonably deems to be relevant, the determinate sentencing law's requirement that an upper term sentence be imposed only if an aggravating factor exists is comparable to *Booker's* requirement that a federal judge's sentencing decision not be unreasonable.

*Id.* at 548.

{44} After reaffirming the propriety of judicial factfinding and discretion in indeterminate sentencing schemes, *Blakely* points out that facts thus determined by a sentencing judge "do not pertain to whether the defendant has a legal *right* to a lesser sentence—and that makes all the difference insofar as judicial impingement upon the traditional role of the jury is concerned." 124 S.Ct. at 2540. *Blakely* also emphasizes the word "right" in a later passage. "As *Apprendi* held, every defendant has the *right* to insist that the prosecutor prove to a jury all facts legally essential to the punishment." *Id.* at 2543.

{45} Unless convicted criminals in New Mexico have a right to receive only the basic sentence for their crimes, we are not persuaded a trial court's finding of aggravating factors must be viewed as increasing the statutorily-authorized penalty for an offense. The statute requires a hearing concerning aggravating and mitigating factors in every case. *Wilson,* 2001–NMCA–032, ¶ 29, 130 N.M. 319, 24 P.3d 351. If it cannot be said that such a finding increases the

sentence beyond the statutory maximum, then *Frawley's* understanding of *Blakely*, even if correct, does not apply to the New Mexico sentencing scheme. If, on the other hand, *Wilson* was correct in concluding that the Legislature intended to and succeeded in creating ranges of permissible sentences, of which the basic sentence is the midpoint, and that a convicted criminal has no right to a sentence at the midpoint, then it would follow that a judicial finding under Section 31–18–15.1 does not increase the sentence beyond the statutory maximum.

{46} We perceive ambiguity within *Blakely* and *Apprendi* that has contributed to inconsistent opinions from the Court of Appeals. We believe that *Booker* provides a basis for believing *Wilson* was decided correctly. As the California Supreme Court has reasoned in *Black*, the United States Supreme Court cases ought not be viewed as "draw[ing] a bright line, but *Booker* makes clear that the concept of a discretionary sentencing decision is not limited to those decisions that involve complete, unguided, and unreviewable discretion." *Black*, 29 Cal.Rptr.3d 740, 113 P.3d at 547.

### C

{47} Both *Booker* and *Blakely* considered statutory schemes in which a range had been established but the sentencing judge was authorized or required to go above the maximum of the range if the judge found a specified fact or facts. In *Blakely*, the range was between 49 and 53 months. 124 S.Ct. at 2535. In *Booker*, the range was from 210–262 months. 125 S.Ct. at 746. In *Blakely*, the judge was authorized to exceed the maximum in the range if he or she made a finding of an aggravating factor from a list meant to be illustrative. 124 S.Ct. at 2535. In *Booker*, the judge was required to exceed the maximum in the range if he or she made findings that mandated a different range. 125 S.Ct. at 746. The federal sentencing guidelines and Washington sentencing scheme both appear to have involved initial sentencing ranges, based on factors such as prior criminal history and the particular offense reflected by the jury verdict. *See Booker*, 125 S.Ct. at 746; *id.* at 775 (Stevens,

J., dissenting); *State v. Nordby*, 106 Wash.2d 514, 723 P.2d 1117, 1118 (1986) (en banc) ("The presumptive sentence range for this crime . . . is determined by combining the seriousness level of vehicular assault with Nordby's criminal history.").

{48} Statements made in *Apprendi*, *Blakely*, and *Booker* about the limiting effect of the facts reflected in the jury verdict or admitted by the defendant become less clear when viewed in light of the statutory scheme in which the statements were made. The statement "that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant*," *Blakely*, 124 S.Ct. at 2537, might be read to mean the maximum of the initial range set by the respective statutes, or it might be read to mean the minimum of that range. *Booker* indicates that the former was intended. Justice Stevens states in his decision for the majority that "when a trial judge exercises his discretion to select a specific sentence within a defined range, the defendant has no right to a jury determination of the facts that the judge deems relevant." *See Booker*, 125 S.Ct. at 750. In his dissent, furthermore, he offers an example of a sentencing judge using her discretion "to sentence within 'the defendant's initial sentencing range' and 'rely[ing] upon factual determinations beyond the facts found by the jury.'" *Id.* at 775 (Stevens, J., dissenting).

{49} The statement in *Blakely* "that 'the statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant," 124 S.Ct. at 2537, is ambiguous in another way. The word "solely" may mean "without additional factfinding" or it may mean "without taking into account his or her discretion within a range." *Booker*, as discussed above, suggests the former was intended.

{50} There is a comparable sentence in *Apprendi*, reaffirmed in *Booker*, about the limitations imposed upon a sentencing judge by a jury's verdict or a plea, which is less clear when taken out of context. That statement is: "Any fact (other than a prior convic-

tion) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S.Ct. at 756–57. That sentence might mean that a sentencing judge cannot sentence within a range but rather must sentence a defendant to the minimum of the range. Alternatively, the sentence might mean that the Legislature may not authorize exceeding the maximum of the range on the basis of a fact or facts found by the judge following a jury verdict or a guilty plea. The majority opinion by Justice Stevens indicates that the latter was intended.

{51} In addition, by adopting the remedy that the federal sentencing guidelines should be treated as advisory, the remedial majority in *Booker* has indicated that a sentencing judge may be given discretion to consider facts other than those that are implicit in the jury's verdict or admitted by a defendant. Justice Breyer, writing for the remedial majority, severed and eliminated the portions of the federal sentencing statute that made the guidelines mandatory, as well as the provisions for appellate review, and authorized sentencing judges to exceed the initial sentencing range in light of other statutory concerns surrounding the circumstances of the offense and the offender. *Booker*, 125 S.Ct. at 756–57.

{52} The New Jersey Supreme Court adopted a similar remedy after considering that its sentencing scheme could not survive after *Blakely*. *See Natale*, 878 A.2d at 741 (eliminating presumptive terms from the New Jersey sentencing scheme and recognizing the top of the sentencing range as the statutory maximum authorized by the jury verdict). The North Carolina Supreme Court, on the other hand, rejected that remedy, on the ground "that the choice of remedy is properly within the province of the" Legislature. *See State v. Allen*, 359 N.C. 425, 615 S.E.2d 256, 272 (2005). The court also observed that until its decision "no two state supreme courts [had] resolved *Blakely* issues in the same manner." *Id.* at 271 n. 7 (summarizing the results in a number of recent cases).

{53} We recognize that a majority of state supreme courts have reasoned as did the Court of Appeals in *Frawley* that *Blakely's* discussion of the relevant statutory minimum within Washington's sentencing scheme requires a state court to equate the presumptive sentence in a determinate sentencing scheme with the punishment authorized by the jury's verdict. *See, e.g., Natale*, 878 A.2d at 737–38 (summarizing the varying conclusions); *Smylie v. State*, 823 N.E.2d 679, 682–84 (Ind.2005) (holding an increase in the sentence above the presumptive term in Indiana's sentencing scheme unconstitutional under *Blakely*). We are more persuaded by the reasoning of the California Supreme Court in *Black*.

{54} In *Black*, the California Supreme Court was impressed that "*Apprendi, Blakely,* and *Booker* all make clear that judicial factfinding is acceptable in the context of a discretionary sentencing decision." 29 Cal. Rptr.3d 740, 113 P.3d at 547. The court also was impressed that *Booker* expressed, as a matter of policy, a concern that there was " 'a new trend in the legislative regulation of sentencing' " as a result of which legislatures selected facts that authorized greater punishment and permitted judges to find those facts after the jury had reached its verdict. *Id.* 29 Cal.Rptr.3d 740, 113 P.3d at 544 (quoting *Booker*, 125 S.Ct. at 751). The California Supreme Court concluded that the California sentencing scheme did not "implicate the concerns described in the majority opinion in *Booker.*" *Black*, 29 Cal.Rptr.3d 740, 113 P.3d at 544. The court viewed *Booker* and *Blakely* as having "established a constitutionally significant distinction between a sentencing scheme that permits judges" to exercise judicial discretion within a range and one "that assigns to judges the type of factfinding role traditionally exercised by juries in determining the existence or nonexistence of elements of an offense." *Id.* 29 Cal.Rptr.3d 740, 113 P.3d at 542. The court believed its own sentencing scheme illustrated the former rather than the latter. *Id.* 29 Cal. Rptr.3d 740, 113 P.3d at 548.

{55} We similarly conclude that *Wilson* properly construed Section 31–18–15.1. Our Legislature did not intend to con-

fer a right to a basic sentence but rather to limit the trial court's discretion to punish within a range by taking into consideration a wide range of circumstances, and to provide for meaningful appellate review. We believe our sentencing scheme reflects an appropriate legislative deference to judicial discretion in sentencing as well as respect for the jury's role in determining guilt or innocence of crimes defined by statute. The mandatory language of Section 31–18–15(B) and writing requirement of Section 31–18–15.1(A) were intended to limit the judge's sentencing discretion by imposing a standard of reasonableness, rather than creating a right in defendants to be sentenced to the basic sentence. *See Black,* 29 Cal.Rptr.3d 740, 113 P.3d at 543–44. "[T]he upper term is the 'statutory maximum' for purposes of Sixth Amendment analysis," and the judge's sentence pursuant to Section 31–18–15.1 "will be upheld 'as long as the judge exercises his or her discretion in a reasonable manner....'" *Id.* 29 Cal.Rptr.3d 740, 113 P.3d at 545. We believe New Mexico's sentencing scheme, so construed, is consistent with *Booker.* We also conclude that neither *Blakely* nor *Booker* require us to depart from the conclusion in *Wilson,* based on this construction, that Section 31–18–15.1 is not unconstitutional. We conclude, as did the California Supreme Court in reviewing its state's sentencing scheme, that New Mexico's sentencing scheme illustrates an appropriate reliance on judicial discretion to sentence following a jury verdict, bench trial, or guilty plea.

**D**

{56} Although Defendant has not challenged the aggravation of his sentence for conspiracy, we discuss the sentencing hearing to illustrate the operation of Section 31–18–15.1. The State filed a notice that it would "seek aggravating circumstances" and "requests the court to alter the basic sentence." At the sentencing hearing, the court heard the prosecutor state the sentence provided by Section 31–18–15 for each of Defendant's convictions. The court then heard argument. The State contended that Defendant threw Stark into the well while he was alive, resulting in increased suffering for him and for his family, and that the jury had

reached this conclusion. In addition, the State contended that Defendant had shown neither remorse nor recognition of guilt. The State argued for an upward alteration or aggravation of all six non-homicide counts. At the same time, and for the same reasons, the State argued that all seven sentences should run consecutively. Defendant argued that Sedler was the principal in the murder of the victim and that he assisted Sedler out of fear for his life. In addition, Defendant argued for a number of mitigating circumstances, including his mental capacity, the nature of his childhood, his unmet need for medication at the time of the crimes, and that the crime of murder was out of character because his prior crimes were offenses against property and committed to obtain money for drugs.

{57} The district court stated that Defendant's crime was "a very egregious killing." The court thought that the jury had concluded that the victim was alive when thrown in the well and thus suffered as the State had argued. The court first imposed the sentence provided in Section 31–18–15 for each count, then announced that the sentence for counts one and two would run consecutively, and that the sentences for the other five counts would run concurrent with one another and the sentences for counts one and two. Under Section 31–18–15.1, the court aggravated the sentence for conspiracy to commit first degree murder, the second count, by one-third. The Court indicated that it found aggravating circumstances. The court apparently found no mitigating circumstances or concluded they were outweighed by the aggravating circumstances. The Court apparently sentenced Defendant for conspiracy to commit felony murder as a second degree felony resulting in death because he aggravated a sentence of fifteen years to twenty years. *See* § 31–18–15(A)(2) (providing a fifteen year sentence for a second degree felony that results in death).

{58} The judge's decision is consistent with our cases. Our cases have held that "[w]e will uphold the trial court's aggravation of a sentence if the circumstances relied on are supported in the record and constitute proper factors to consider under the en-

hancement statute." *State v. Wilson,* 117 N.M. 11, 19, 868 P.2d 656, 664 (Ct.App.1993). We believe the decision the judge made in imposing the sentence on Count II is consistent with that holding.

{59} This Court has held that a court may not aggravate a sentence based on "elements of either the offense for which the defendant was sentenced or a separate, but contemporaneous, conviction." *Swafford v. State,* 112 N.M. 3, 16 & n. 10, 810 P.2d 1223, 1236 & n. 10 (1991) (distinguishing *State v. Cawley,* 110 N.M. 705, 799 P.2d 574 (1990) (affirming an aggravated sentence partially based on the age of the victims, which was an element of the offense of criminal sexual contact of a minor)). We implied, but did not state, that double jeopardy was the reason for the holding. *Id.; see also State v. Kurley,* 114 N.M. 514, 516, 841 P.2d 562, 564 (Ct.App.1992).

{60} Circumstances of the crime, even if closely related to the elements, may be the basis for an aggravated sentence. *See, e.g., State v. Castillo–Sanchez,* 1999–NMCA–085, ¶ 28, 127 N.M. 540, 984 P.2d 787 (affirming an aggravated sentence based on the length of the conspiracy); *State v. Fuentes,* 119 N.M. 104, 109–10, 888 P.2d 986, 991–92 (Ct.App.1994) (affirming an aggravated sentence based on Defendant's repeated stabbing of victim, which went beyond the elements necessary for convictions of armed robbery and aggravated assault); *Kurley,* 114 N.M. at 515–16, 841 P.2d at 563–64 (affirming an aggravated sentence partially based on brutality of the defendant's attack on the victim, when the brutality was used to show great bodily harm, an element of the conviction for aggravated battery causing great bodily harm).

{61} We believe our cases decided under Section 31–18–15.1 illustrate the discretion imposed in the judge at sentencing as well as distinguish the role of the jury in determining whether the State has proved the elements of a crime beyond a reasonable doubt. The factors or circumstances on which the trial judge relied in sentencing Defendant do not appear to us to be findings of fact within the meaning of *Blakely* and *Apprendi.* Because we are persuaded that Section 31–18–15.1 as construed in *Wilson* is constitutional,

we believe the remaining question is whether the court abused the discretion the sentencing scheme as construed in *Wilson* entrusts to the court. We believe there was no abuse.

## IV

{62} For these reasons, we affirm Defendant's judgment and sentence. There was sufficient evidence to support his convictions. We hold that Section 31–18–15.1 is constitutional, based on the construction given that statute by *Wilson,* and therefore the aggravation of Defendant's sentence does not violate the Sixth Amendment of the United States Constitution. We overrule *Frawley,* which holds to the contrary. We note that Defendant's sentences for robbery, a third degree felony, and for conspiracy to commit robbery, a fourth degree felony, appear to be incorrect. *See* § 31–18–15 (providing a basic sentence of three years for a third degree felony and a basic sentence of eighteen months for a fourth degree felony). If there has been an error it may be corrected pursuant to Rule 5–113(B) NMRA 2005 or Rule 5–801 NMRA 2005.

{63} **IT IS SO ORDERED.**

WE CONCUR: RICHARD C. BOSSON, Chief Justice, PATRICIO M. SERNA, PETRA JIMENEZ MAES, Justices, and EDWARD L. CHÁVEZ, Justice (concurring in part and dissenting in part).

CHÁVEZ, Justice (concurring in part and dissenting in part).

{64} I agree with the majority that there is sufficient evidence to support defendant's convictions and I therefore concur with Section II of the majority opinion. However, because in my opinion NMSA 1978, Section 31–18–15.1 (1993), while constitutional on its face, may be applied in violation of the Sixth Amendment, I respectfully dissent from Section III of the majority opinion. The majority upholds the constitutionality of Section 31–18–15.1 by combining it with the basic sentence defined in NMSA 1978, Section 31–18–15 (2003) to create a range, reasoning that the combination is appropriate since a defendant does not have a right to be sentenced to the basic sentence. Majority Opinion ¶ 44.

I respectfully disagree with the analysis and conclude that a defendant does indeed have a right to be sentenced to no more than the basic sentence unless and until there is a finding of aggravating circumstances. Yet the real question is whether a defendant has a Sixth Amendment right to have a jury, and not a judge, make the findings that will increase his or her sentence. In my opinion, the United States Supreme Court has consistently answered the question in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005) to require a jury finding of any fact that increases the defendant's sentence beyond the prescribed statutory maximum. In New Mexico, the prescribed statutory maximum is the basic sentence, as evidenced by the plain language of the statute, which requires the imposition of the basic sentence unless altered by the judge. NMSA 1978, Section 31–18–15(B) ("The appropriate basic sentence of imprisonment shall be imposed ... unless the court alters such sentence ..."). An alteration increasing the basic sentence may only occur if there is a finding of aggravating circumstances. NMSA 1978, § 31–18–15.1(A).

{65} In this case, the sentencing judge increased the Defendant's sentence based on his perception that the jury believed the victim remained alive after being tossed in the well. This fact was not found by the jury, and as such the judge's perception may have been misplaced, which illustrates the importance of requiring a jury to make a finding of aggravated circumstances before a judge exercises discretion to increase a sentence. In my opinion, adhering to the Sixth Amendment requirement that a jury find facts which may increase a defendant's confinement does not interfere with judicial discretion. Because I conclude that the United States Supreme Court in *Apprendi, Blakely,* and *Booker* has interpreted the Sixth Amendment to require a jury, absent a waiver by the defendant, to make findings which will increase a basic sentence, I would reverse the five-year increase of Defendant's sentence in this case.

## A DEFENDANT HAS A RIGHT TO BE SENTENCED TO THE BASIC SENTENCE ABSENT A JURY FINDING OF AGGRAVATING CIRCUMSTANCES BEYOND A REASONABLE DOUBT

{66} In *State v. Wilson*, 2001–NMCA–032, ¶¶ 18–21, 130 N.M. 319, 24 P.3d 351, Judge Pickard concisely set forth the historical evolution and intent of the Legislature in enacting Section 31–18–15.1. Important to this history was the noble goal of the Legislature to promote uniformity in sentencing by specifying a basic sentence and then requiring a sentencing judge to articulate findings of aggravating circumstances to justify increasing the period of confinement beyond the basic sentence. The majority concludes that a defendant does not have a right to be sentenced to the basic sentence. Majority Opinion ¶ 54. This appears to me to be the polestar rationale for its conclusion that the Sixth Amendment does not preclude a sentencing judge from finding aggravating circumstances, which may lead to an increased period of incarceration. I respectfully disagree.

{67} In my opinion, under a plain reading of the sentencing statutes, a defendant has a right to expect that he or she will receive the basic sentence, unless and until there is an articulated finding of either mitigating or aggravating circumstances. This is how the Legislature sought to accomplish uniformity in sentencing—by requiring an explanation of the findings justifying a departure from the basic sentence. If a sentencing judge finds mitigating circumstances, (s)he may reduce the basic sentence by up to one-third. This reduction does not have to be based on a jury finding of mitigating circumstances because the jury verdict during the guilt phase already authorizes a greater sentence, the basic sentence.

{68} If a sentencing judge finds aggravating circumstances, (s)he may increase the basic sentence by up to one-third. As with mitigating circumstances, the sentencing judge must articulate the findings in the record. NMSA 1978, § 31–18–15.1(A). Requiring the sentencing judge to articulate the findings allows the appellate courts to determine whether the findings are supported by

the record. *See State v. Wilson,* 117 N.M. 11, 19, 868 P.2d 656, 664 (Ct.App.1993) ("We will uphold the trial court's aggravation of a sentence if the circumstances relied on are supported in the record and constitute proper factors to consider under the enhancement statute."). As demonstrated by appellate court opinions, aggravating circumstances require findings of fact and not simply the consideration of sentencing factors. *See e.g. Swafford v. State,* 112 N.M. 3, 17, 810 P.2d 1223, 1237 (1991) ("[W]e save for later the question of the reliability of a lack of remorse as a significant factor in sentencing. In the interests of justice, in any event, future sentence enhancements based on a lack of remorse will merit *specific findings,* and where not so supported will be subject to careful scrutiny on review." (emphasis added)). Because findings of fact which constitute aggravating circumstances are required to permit a sentencing judge to increase the basic sentence, I agree with the United States Supreme Court that the Sixth Amendment requires a jury to make these specific findings. This is because the jury verdict alone does not authorize the increased sentence. The basic sentence is the maximum authorized by the jury verdict. Additional findings are required to increase the basic sentence. These findings should be made by a jury beyond a reasonable doubt following the guilt phase. Of course, the defendant may stipulate to the facts that constitute aggravating circumstances or waive a jury finding of such aggravating circumstances, in which case the Sixth Amendment is not implicated.

## THE JUDGE'S SPECULATION ABOUT WHAT THE JURY FOUND IN ORDER TO INCREASE THE BASIC SENTENCE ILLUSTRATES THE IMPORTANCE OF REQUIRING A JURY FINDING OF AGGRAVATING CIRCUMSTANCES

{69} In this case, before increasing Defendant's sentence by one-third for conspiracy to commit murder, the judge stated:

> For the reasons pointed out by the state this was a very egregious killing. And I'm satisfied that the jury felt—and there's certainly sufficient evidence—that when [the victim] was thrown into the well he was still alive. And he was left to die

there without having means of extricating himself from his predicament. The well was covered over. And the evidence before the jury and the court was that he didn't die from the blow in the head. I just see no mitigating circumstances in this case.

{70} The sentencing judge both speculated about what the "jury felt" and weighed the evidence on a critical issue, which he ultimately relied on to increase Defendant's sentence. The issue is critical because during trial the prosecution was adamant that the evidence proved the victim was alive after being tossed into the well. The prosecution also argued vehemently that the evidence established that Defendant knew the victim was alive when he helped to toss him in the well. Defendant's version, as presented through the testimony of the investigating officer who took Defendant's statement, was that the co-defendant had killed the victim during a robbery, and that out of fear for his own life, Defendant assisted the co-defendant in tossing the lifeless body into the well.

{71} Important to my analysis is the fact that the jury acquitted Defendant of first-degree premeditated murder. They found him guilty of first-degree felony murder, and perhaps as an accomplice. We do not know which because a special interrogatory is not required for accomplice liability. The speculation by the sentencing judge as to what the "jury felt" may not be unreasonable. However, one might also reasonably speculate that the jury had a reasonable doubt that the victim remained alive once tossed in the well. Did their acquittal of Defendant for premeditated murder mean the jury rejected the prosecutor's argument that the victim remained alive in the well with Defendant covering the well to leave the victim there to die? If so, the judge's finding that the victim "was left to die there without having means of extricating himself from his predicament" was inconsistent with the jury finding. Did the jury reject the prosecutor's argument that Defendant knew the victim was alive after being tossed in the well? Did the jury find Defendant's version of the events closer to the truth? Did the jury accept Defendant's version that he believed the victim was

already dead when the victim was tossed in the well? Defendant's version of the events certainly is sufficient to support a conviction for felony murder under an accomplice theory, and could also explain why the jury acquitted him of premeditated murder. After all, if the prosecution was correct that the victim was alive after being tossed in the well, and that Defendant covered the well knowing the victim was alive in order to prevent the victim from getting out and saving himself, what better evidence of premeditated murder? Suffice it to say that adherence to the Sixth Amendment would have permitted the jury to clarify for the court whether it believed the victim was alive after being tossed in the well and was left there to die. Such a jury finding would constitutionally permit the sentencing judge to exercise discretion to increase the basic sentence by one-third under the provisions of Section 31-18-15.1. If the jury did not make such a finding, the very rationale relied on by the judge for increasing Defendant's sentence would not have been supported in the record and the increase would not have been permissible.

## A SENTENCING JUDGE'S DISCRETION IS NOT COMPROMISED BY A JURY'S CONSIDERATION OF EVIDENCE OF AGGRAVATING CIRCUMSTANCES

{72} During oral argument, some concern was expressed regarding the importance of judicial sentencing discretion and how reversing the enhanced sentence in this case might interfere with that discretion. As a preface to my discussion of *Apprendi, Blakely,* and *Booker,* I think this concern merits comment. I firmly believe a sentencing judge must have discretion in sentencing a defendant convicted of committing a crime. Requiring a jury finding of aggravating circumstances does not interfere with this discretion. Even if a jury finds aggravating circumstances, the sentencing judge does not automatically increase the basic sentence by one-third. The judge may increase it by less or not at all. Likewise, if a jury does not find aggravating circumstances, the judge's sentencing discretion is still not frustrated. Although the sentencing judge may not in-

crease the basic sentence, the judge may still use discretion in deciding whether to run the sentences concurrently or consecutively, whether to suspend or defer a sentence, or to determine the period and conditions of probation or parole. In doing so, the judge may consider pre-sentence reports, victim impact statements, the circumstances of the crime and the character of the defendant.

> We should be clear that nothing in this history suggests that it is impermissible for judges to exercise discretion—taking into consideration various factors relating both to offense and offender—in imposing a judgment within the range prescribed by statute. We have often noted that judges in this country have long exercised discretion of this nature in imposing sentence[s] within statutory limits in the individual case.

*Apprendi,* 530 U.S. at 481, 120 S.Ct. 2348 (emphasis omitted).

{73} What occurred during the sentencing of Defendant illustrates how a sentencing judge may continue to exercise discretion, whether or not a jury makes a finding of aggravating circumstances. At the sentencing hearing, the prosecutor urged the sentencing judge to impose the maximum sentence on Defendant. Life in prison for felony murder. Fifteen years for conspiracy to commit murder. Nine years for robbery. Three years for conspiracy to commit robbery. Eighteen months for tampering with evidence. Three years for burglary. Eighteen months for felon in possession of a firearm.[2] The prosecutor also asked that the sentences for all but the felony murder be increased by one-third and that all of the sentences run consecutively. The basic sentences would have totaled life plus thirty-three years if run consecutively. The prosecution also sought an increase of sixteen and one-half years, which would have resulted in a total sentence of life plus forty-nine and one-half years.

{74} Although the sentencing judge increased the fifteen year sentence for conspiracy to commit murder by five years, the judge declined to run all of the sentences

---

**2.** Defendant waived a jury trial on the issue of    felon in possession of a firearm.

consecutively. Instead, the judge sentenced Defendant to life plus twenty years, deciding to run the sentences for Counts III–VII concurrent with sentences for Counts I and II. Assuming the jury was asked to, and did, find aggravating circumstances, the sentencing judge could still have imposed the same sentence. Alternatively, had the jury rejected the aggravating circumstance(s), the sentencing judge could have imposed the same sentence by exercising discretion to run more sentences consecutively so as to still arrive at a sentence equaling life plus twenty years. In my judgment, the sentencing judge exercised wisdom, justice and sound discretion in sentencing Defendant. However, that is not the issue. The issue is whether the United States Supreme Court has interpreted the Sixth Amendment to require juries to make findings of aggravating circumstances before a sentencing judge may exercise discretion to increase a basic sentence. For the following reasons I believe it has.

## THE UNITED STATES SUPREME COURT HAS INTERPRETED THE SIXTH AMENDMENT TO REQUIRE JURIES TO FIND BEYOND A REASONABLE DOUBT FACTS THAT MAY INCREASE A DEFENDANT'S SENTENCE

{75} At issue here is whether the sentence enhancements authorized by Section 31–18–15.1 are constitutional in light of the United States Supreme Court's recent holdings in *Blakely* and *Booker*. In *Blakely*, the Court invalidated a Washington sentencing scheme which provided a basic sentencing range authorized by a defendant's plea or jury finding of guilt, but which granted the judge the discretion to enhance the sentence above the basic range, up to a separately defined statutory maximum, if the judge found "substantial and compelling reasons justifying an exceptional sentence." 124 S.Ct. at 2535 (internal quotation marks and citations omitted). There, the defendant pleaded guilty to kidnapping, a Class B felony punishable by incarceration for no more than 10 years. *Id.* However, specific provisions of Washington law required the judge to sentence the defendant to a standard range of 49 to 53 months, based on the defendant's "offender score" and the seriousness of the crime, unless the judge found aggravating facts justifying an exceptional sentence. *Id.* Although the prosecutor recommended imposition of the standard sentence, after a sentencing hearing the judge found that the defendant had acted with deliberate cruelty and had done so in the presence of his minor child. *State v. Blakely*, 111 Wash.App. 851, 47 P.3d 149, 157 (2002), *rev'd by* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403. Based on finding these two aggravating circumstances, the judge increased the sentence to 90–months. *Blakely*, 124 S.Ct. at 2535–36. Note the similarity with New Mexico's statute, which requires imposition of a basic sentence unless the judge finds aggravating circumstances justifying an increase of the basic sentence by up to one-third.

{76} The Supreme Court held the Washington statute violated the Sixth Amendment because it violated the rule in *Apprendi* that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Blakely*, 124 S.Ct. at 2536 (internal quotation marks omitted).[3] The Court rejected the State's argument and the Washington Court of Appeals' analysis that the sentence did not violate the rule in *Apprendi* because the verdict authorized a sentence up to 10 years as a class B felony conviction. *Id.* at 2537. Instead, the Court concluded that the "statutory maximum" for *Apprendi* purposes was 49 to 53 months, the maximum sentence authorized solely by facts reflected in the defendant's plea or a jury verdict, rather than the separately defined maximum up to which a judge could elevate a standard sentence based on facts not admitted by a defendant or found by a jury. *Id.* at 2536. Because Washington law mandated sentencing within the basic range authorized by a defendant's plea or jury verdict, and only granted discretion to the judge to enhance a sentence be-

---

**3.** Washington has since amended its sentencing scheme to permit enhancement of a sentence following a jury finding of certain aggravating circumstances, one being a finding of deliberate cruelty. Wash. Rev.Code § 9.94A.535 (2005).

yond this range after finding facts not found by a jury, the Court held that the defendant's enhanced sentence violated the defendant's Sixth Amendment right to trial by jury. *See id.* at 2543. Applying this analysis, I conclude that since the New Mexico Legislature mandates imposition of the basic sentence, and only grants discretion to the judge to increase the basic sentence upon a finding of aggravating circumstances, that an increased sentence would violate the Sixth Amendment if increased without a jury finding of the aggravating circumstances.[4]

{77} Similarly, in *Booker*, the United States Supreme Court held that the Federal Sentencing Guidelines violated the Sixth Amendment by authorizing a sentencing judge to enhance a sentence above the amount permitted by the plea or jury verdict alone, based on the judge's determination of a fact that was not found by the jury or admitted by the defendant. 125 S. Ct at 755–56. In *Booker*, the defendant was found guilty by a jury of possession with intent to distribute more than 50 grams of crack cocaine, based on evidence presented to the jury that defendant possessed 92.5 grams. *Id.* at 746. The Anti–Drug Abuse Act (ADAA) prescribed only two quantity-based offenses per drug type, in this case, crack cocaine: (1) the offense of possessing with intent to distribute at least 5 grams of cocaine base, not involving death or serious bodily injury, punishable as 5 to 40 years, 21 U.S.C. § 841(b)(1)(B)(iii) (1986); and (2) the comparable offense of possessing at least 50 grams, punishable as 10 years to life. 21 U.S.C. § 841(b)(1)(A)(iii); *see* 18 U.S.C. § 3551 *et seq.* (2000); 28 U.S.C. §§ 991–998 (2000). Had Congress not acted further, a life sentence would have constituted the relevant "statutory maximum" for *Apprendi* purposes under the federal scheme; therefore, the defendant's conviction would have permitted the trial judge to sentence him to any term between 10 years and life in prison.

{78} However, Congress altered the relevant "statutory maximum" when the Federal Sentencing Commission, cloaked with legislative authority, adopted narrower guidelines prescribing mandatory sentencing ranges based on a defendant's criminal history and offense level. *See* 28 U.S.C. § 994 (1984); *Mistretta v. United States,* 488 U.S. 361, 367, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (stating that Federal Sentencing Guidelines were binding on the courts). Under these mandatory guidelines, Booker's criminal history qualified him as a category VI offender, and the jury finding that he possessed 92.5 grams of crack made his crime a level 32 offense. *United States v. Booker,* 375 F.3d 508, 510 (7th Cir.2004) (citing U.S. Sentencing Guidelines Manual §§ 2D1.1(c)(4), 4A1.1 (Nov. 2003) ("U.S.S.G." or "Guidelines"), and explaining that under the Guidelines, 32 is the base offense level when a defendant possesses at least 50 grams but less than 150 grams of crack). The sentencing table under the Guidelines mandated that a trial judge select a "base" sentence of 210 to 262 months incarceration for a category VI criminal committing a level 32 offense. *See* U.S.S.G. §§ 2D1.1(c)(4), 4A1.1. Thus, under the Guidelines, the "statutory maximum" for *Apprendi* purposes, under which the judge could sentence Booker based on the plea or jury verdict alone, was 262 months rather than life.

{79} However, at a sentencing hearing the trial judge found by a preponderance of the evidence that Booker possessed a total of 658.5 grams of crack and that he had obstructed justice. *Booker,* 125 S.Ct. at 746, 763. Based on these findings, while Booker's criminal history remained a category VI, his offense level was increased to 36 for possessing between 500 grams and 1.5 kilograms of crack, and was increased another two levels because of the finding of obstructing justice. *See Booker,* 375 F.3d at 509; U.S.S.G. § 4A1.1, 3C1.1. These findings mandated a sentence under the Guidelines of between 360 months and life imprisonment. The judge chose the lowest sentence within the range and sentenced Booker to 30 years. *Booker,* 125 S.Ct. at 746 ("Thus, instead of the sentence of 21 years and 10 months that the judge could have imposed on the basis of the facts proved to the jury beyond a reasonable doubt, Booker received a 30–year sentence.").

4. Assuming the defendant has not waived the     jury requirement or admitted the facts.

542

{80} In invalidating Booker's sentence under the mandatory Guidelines, the United States Supreme Court reaffirmed its holding in *Apprendi* that "[a]ny fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt." *Booker*, 125 S.Ct. at 756. The Court explained that had the Guidelines been "advisory provisions that recommended, rather than required, the selection of particular sentences in response to differing sets of facts, their use would not implicate the Sixth Amendment," as there has never been any doubt about the authority of a judge to exercise discretion in imposing a sentence within a statutory range. *Id.* at 750 (citing *Apprendi*, 530 U.S. at 481, 120 S.Ct. 2348; *Williams v. New York*, 337 U.S. 241, 246, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949)). However, because the Guidelines were mandatory, the statutory range for *Apprendi* purposes was not 10 years to life, as stated in Section 841(b)(1)(A)(iii), but rather 210 to 262 months based on Booker's criminal history and the quantity of drugs the jury found he possessed. In other words, the statutory range Booker faced based solely on the jury finding that he possessed 92.5 grams of crack was 210 to 262 months, not 10 years to life. Had the jury considered evidence and found beyond a reasonable doubt that Booker possessed 658.5 grams of crack and was guilty of obstruction of justice, the statutory range would have been 360 months to life. Under the latter hypothetical, the sentence imposed on Booker would not have violated his Sixth Amendment rights.

{81} To remedy the constitutional vice, the United States Supreme Court severed and excised two provisions of the Federal Sentencing Act: (1) the provision requiring sentencing courts to impose a sentence within the Guidelines range, and (2) the provision that set forth standards for review of sentences on appeal. *Booker*, 125 S.Ct. at 764 (citing 18 U.S.C. §§ 3553(b)(1), 3742(e) (Supp.2004)). As applied to Booker, this remedy effectively made the Guidelines discretionary so that the jury finding that the defendant was guilty of possessing over 50 grams of crack cocaine authorized a sentence of incarceration between 10 years and life. A judge could then exercise discretion to sentence the defendant to any period between 10 years and life by consulting the Guidelines and other sentencing goals. *See id.* at 764 (citing 18 U.S.C. § 3553(a) (Supp. 2004)).

{82} New Mexico's sentencing statute provides a basic sentence for different degrees of noncapital felonies, based on a defendant's guilty plea or a jury finding of guilt. NMSA 1978, § 31–18–15. The judge must hold a sentencing hearing to determine the existence of aggravating or mitigating circumstances. NMSA 1978, § 31–18–15.1(A). A judge has discretion on whether or not to alter a basic sentence up to one-third of the basic range "upon a finding by the judge of any mitigating or aggravating circumstances surrounding the offense or concerning the offender." *Id.* In making such findings, the judge may rely on any evidence or statements he or she finds useful. *Id.* If a judge enhances a sentence, Section 31–18–15.1 requires a judge to state his or her reasons for doing so on the record, which allows appellate courts to review the increase to ensure the reasons are supported in the record and not based on an improper motive. *See, e.g., Reyes v. Quintana*, 853 F.2d 784, 785 (10th Cir.1988).

{83} The State urges us to uphold our sentencing scheme as providing a broad range authorized by a guilty plea or jury verdict within which a judge has unfettered sentencing discretion. The majority does so. Indeed, before the United States Supreme Court decided *Blakely*, the New Mexico Court of Appeals held that Sections 31–18–15 and 31–18–15.1 should be read together to provide a range of permissible sentencing, and that sentencing within this range was constitutional under *Apprendi* so long as the judge placed on the record any finding of aggravating or mitigating circumstances. *Wilson*, 2001–NMCA–032, ¶ 4, 130 N.M. 319, 24 P.3d 351. This holding was called into question by a different panel of the Court of Appeals, which held Section 31–18–15.1 unconstitutional in light of *Blakely. State v. Frawley*, 2005–NMCA–017, ¶¶ 12–13, 137

N.M. 18, 106 P.3d 580. This panel concluded that the basic sentence in Section 31–18–15 was the maximum sentence a judge could impose solely on the basis of the facts reflected in the jury verdict. *Id.* at ¶¶ 12–13. The Court of Appeals in *Frawley* read *Blakely* to say:

> When the jury considers the facts relevant to the elements of an offense in determining guilt or innocence, the criminal sanctions for that offense cannot be increased after the verdict based on facts the jury has not specifically considered in connection with its finding of guilt, whether or not the facts are labeled "sentencing factors," and even if the facts are not material to the statutory elements of the offense.

*Id.* at ¶ 12.

{84} As explained in *Frawley*, the United States Supreme Court explicitly rejected an approach taken by the Washington court in *Blakely*, which was similar to our Court of Appeals' analysis in *Wilson*, and now to the analysis of the majority. *See Frawley*, 2005–NMCA–017, ¶¶ 11–13, 137 N.M. 18, 106 P.3d 580. In *Blakely*, the Washington court had read the statutory provisions together to provide a permissible range of sentencing up to a statutory maximum, so that a judge's finding of aggravating factors did not increase the punishment authorized by a jury's findings or defendant's plea. *See Blakely*, 47 P.3d at 159, *rev'd by* 124 S.Ct. at 2537–38. In rejecting the Washington court's reasoning, the Supreme Court emphasized that:

> [T]he relevant statutory maximum is not the maximum sentence a judge may impose after finding additional facts, but the maximum [sentence] he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Blakely*, 124 S.Ct. at 2537 (internal citation omitted). The Washington Court of Appeals' attempt to construe the 90 month sentence as falling within the statutory range of no more than 10 years for a Class B felony failed because the trial judge was required to impose a standard sentence of 49 to 53 months

unless the judge found aggravating facts justifying an exceptional sentence. *Id.* at 2537–38. Stated differently, the statutory maximum based on the guilty plea or jury verdict alone was 53 months, not 10 years, and enhancing the sentence above that amount based on judicial findings violated the Sixth Amendment. Stated in terminology used by the majority, the defendant had a right to be sentenced to 53 months, not anything up to 10 years. Before the defendant could be sentenced to more than 53 months, the United States Supreme Court held that the defendant had a Sixth Amendment right to have a jury make the requisite findings justifying the increase.

{85} My interpretation of *Apprendi*, *Blakely*, and *Booker* leads me to conclude that Section 31–18–15.1 is not unconstitutional on its face but, nevertheless, may be unconstitutional as applied. A trial judge, even upon finding aggravating circumstances, is not required to increase a sentence and therefore may apply the statute in a manner that comports with *Blakely*. Therefore the statute is constitutional on its face. However, I believe the trilogy of *Apprendi*, *Blakely*, and *Booker* requires us to determine the maximum sentence authorized solely by the facts established by a plea of guilty or facts established at trial and reflected in a jury verdict. If the trial judge enhances a sentence above the statutory basic sentence after finding facts not supported by a plea of guilty or the jury verdict, the increased sentence violates the Sixth Amendment. This is true regardless of whether the judge is required to increase the sentence or has discretion to increase the sentence; in either scenario the sentence violates the rule in *Apprendi*, as explained in *Blakely* and *Booker*, because the judge exercises discretion only after finding facts not established by the plea or facts not established at trial and reflected in the jury verdict. *Blakely*, 124 S.Ct. at 2537 ("Our precedents make clear, however, that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." (emphasis omitted)).

{86} Under *Blakely, Booker* and *Apprendi,* Section 31–18–15.1 may be constitutionally applied so long as: (1) the defendant has stipulated to the judicial fact-finding for sentencing purposes; or (2) the defendant admits the facts relied on by the court to increase the sentence. Where the prosecution serves notice of its intent to seek an increase in the basic sentence, unless the defendant admits such facts or stipulates to the judge's authority to decide such facts, I would hold that such facts must be found by a jury beyond a reasonable doubt. Without a jury determination, application of Section 13–18–15.1 under such circumstances would violate the Sixth Amendment under *Blakely* and *Booker.* To the extent *Wilson* (declaring Section 31–18–15.1 to be constitutional) and *Frawley* (declaring Section 31–18–15.1 to be unconstitutional on its face) conflict, I would overrule these cases.

{87} For all of the foregoing reasons, I respectfully dissent from Section III of the majority opinion and would reverse the increase of Defendant's sentence by five years. I would remand to the trial court for imposition of a sentence without the five year increase or to convene a jury to consider whether aggravating circumstances exist which would justify imposition of the increased five year sentence.