1999-NMCA-085

984 P.2d 787

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Gerardo CASTILLO–SANCHEZ,
Defendant–Appellant.**

**No. 19,273.**

Court of Appeals of New Mexico.

May 10, 1999.

Certiorari Denied, No. 25,768,
June 16, 1999.

Patricia A. Madrid, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, for Appellee.

Liane E. Kerr, Liane E. Kerr Law Office, Albuquerque, for Appellant.

## OPINION

HARTZ, Judge.

{1} Defendant appeals his convictions on charges of attempted first-degree murder, conspiracy to commit first-degree murder, conspiracy to commit fraud over $20,000, and attempted fraud over $20,000. He raises five issues on appeal: (1) whether his confession was admissible; (2) whether two audio-taped conversations were admissible; (3) whether the district court properly enhanced his sentence for attempted murder; (4) whether his basic sentence for attempted murder should have been 9 years instead of 15 years; and (5) whether there was sufficient evidence to support his convictions for conspiracy to commit fraud and attempted fraud. We reverse the conviction for conspiracy to commit fraud but affirm in all other respects.

## I. BACKGROUND

{2} Vicente Zamarron hired Jose Reyes and Defendant to kill Zamarron's wife, Linda. Zamarron promised to pay Reyes and Defendant $50,000 for the murder with the proceeds Zamarron expected to collect from four life insurance policies he had taken out on Linda's life. Linda was murdered in her trailer. She suffered multiple blows to the head, multiple stab wounds, and strangulation. The cause of death was strangulation.

{3} Several months after the murder, Reyes and Defendant had not been paid in full by Zamarron. After consulting with Reyes, Defendant tape recorded a conversation between Zamarron and himself. The purpose was to obtain evidence implicating Zamarron in the plot and thereby prevent Zamarron from pointing the blame at Reyes and Defendant and claiming extortion by them. Later, Reyes decided to turn himself in. He hired a lawyer who contacted the authorities. At their instigation Reyes arranged a conversation with Zamarron that he recorded.

{4} Reyes then cooperated with the police to lure Defendant, who lived in Mexico, back into the United States. Once Defendant crossed the border, he was arrested. During police interrogation he confessed that Zamarron offered to pay him to murder Linda and that he committed the murder eight months to a year later. He stated that he stabbed her once with a knife, choked her with a telephone cord, and hit her with a rock. He said that Reyes had no involvement with or prior knowledge of the crime.

{5} At trial, however, Defendant claimed that he had lied in the confession to protect Reyes. Although he admitted significant involvement, he denied committing the fatal acts. His account at trial was as follows: Reyes introduced Defendant to Zamarron, who wanted to hire someone to kill his wife. Defendant was willing to help Reyes so that he could get some money for himself and pay off a debt to Reyes. They talked about killing Linda by strangling her. Reyes drove him to the trailer where Zamarron and his wife lived. Taking a phone cord with him, Defendant entered the trailer by himself. The trailer was unoccupied. He looked for money that Zamarron said would be in the safe, but he found none. When Linda arrived home, she discovered him and tried to flee. In the ensuing struggle she tried to protect herself with a kitchen knife, but he forced it from her and stabbed her with it. He also kicked her in the face. As he fled the trailer, she lay motionless. He then took her car and drove to meet Reyes. He told Reyes that he had not found any money in the trailer and that he was not sure whether Linda was okay. Reyes was angry and left quickly, apparently to go back to the trailer. Reyes returned thirty to forty-five minutes later. Defendant was relieved to learn at trial that the cause of death had been strangulation, multiple blows, and stab wounds, because he had not strangled her or hit her multiple times, and he had stabbed her only once.

## II. DISCUSSION

### A. The Confession

■ {6} Prior to trial, Defendant moved to suppress his confession on the ground that it was obtained in violation of his constitutional rights. The district court rejected Defendant's arguments and denied the motion to suppress. When reviewing the denial of a motion to suppress on appeal, we view the evidence in the light most favorable to the district court's decision. *See State v. Munoz*, 111 N.M. 118, 120, 802 P.2d 23, 25 (Ct.App. 1990). We then determine whether the court properly applied the law when it denied the motion to suppress. *See id.*

{7} The interrogation of Defendant was complicated by the fact that he speaks only Spanish. The record developed at the suppression hearing shows that Defendant was initially taken into custody for interrogation by Officer Norman Rhodes. Rhodes handed Defendant a form with the *Miranda* rights printed in Spanish. Defendant appeared to read the form and made an affirmative nodding gesture when he finished. Because Rhodes did not understand Spanish and was not sure whether Defendant had read or understood the form, he called for Agent Jose Ramirez to act as an interpreter.

{8} Ramirez and Defendant gave conflicting accounts of what happened next. We first summarize Ramirez's version: When he arrived, he read Defendant the rights on the form. Officers Daryl Harris and Ken Christianson arrived about 90 minutes later to commence the interrogation. Harris did not participate in the questioning of Defendant and was present only to tape record the interrogation. Before the interrogation Ramirez again asked Defendant whether he understood his rights, including his right to an attorney. Ramirez told Defendant that he could have an attorney if he wanted one, but Defendant said that he did not want one. Ramirez was sure that Defendant understood his rights, that Defendant never appeared puzzled, and that Defendant knew that he could stop the questioning and ask for an attorney.

{9} In contrast, Defendant testified that while he understood some of the rights read to him, he did not understand what was said about his right to an attorney. He stated that he asked for an attorney before the questioning began and he initially thought

that one of the officers was his attorney. It is unclear from the record, however, which officer he thought was his attorney. He testified that he did not realize that he had no attorney until the officers asked him whether he would help with the investigation of Zamarron.

{10} The principal evidence at the hearing was the recording of the interrogation. It reveals the following: Shortly after the questioning began, Christianson asked Defendant to tell him what happened. Defendant responded by asking, "Who, who can help me?" Ramirez then asked Defendant whether he understood his rights when he signed the form. Defendant responded yes. Ramirez reiterated that the form said that Defendant could ask for an attorney if he needed one, and Ramirez reminded Defendant that he had said that he understood his rights. Ramirez then told Christianson in English that Defendant was asking who could help him now, and that Ramirez had explained that he could ask for an attorney. Christianson told Ramirez that he wanted Defendant to know that an attorney would not change a thing but that Christianson could help Defendant with the truth. Ramirez did not tell Defendant everything that Christianson had said but told Defendant only that Christianson had said that he could help Defendant with the truth. Defendant then proceeded to confess to the murder.

{11} Near the end of the interrogation, Christianson asked Ramirez to discuss the *Miranda* rights again with Defendant to make sure that Defendant understood everything. Defendant acknowledged that he had read the Spanish-language form given to him by Rhodes and had signed it, but he expressed some confusion about his right to an attorney. Defendant contends that he was trying to explain to the officers that he had wanted an attorney during the interrogation and was surprised when he realized that he did not have one. Ramirez, however, testified that he understood Defendant's confusion at the end of the interview to concern whether Defendant could have an attorney to assist him in the future now that he had confessed to the crime. Ramirez was certain that Defendant understood his rights before

confessing and only wanted the assistance of an attorney with whatever proceedings would follow. The transcript could be interpreted to support either version, Defendant's or Ramirez's.

{12} The district court's written order denying Defendant's motion to suppress found that "Defendant was advised of his Miranda Rights, both in writing and orally in his native Spanish language." The court acknowledged that there was a dispute regarding whether Defendant in fact had asked for the assistance of counsel, but it concluded that the credible evidence indicated that Defendant never requested the assistance of an attorney prior to or during the interview. The court also found that nothing occurred during the interview that was coercive or in any way adversely impacted the rights of Defendant. Finally, the court concluded that Defendant's statement was freely and voluntarily made.

{13} Defendant raises two challenges to the admission of his confession. First, he argues that his confession was not given voluntarily. In support of this contention, he points to the fact that he speaks only Spanish, that he signed a waiver-of-rights form before an interpreter arrived, that he had difficulty understanding the interpreter, that he thought one of the officers present at the interrogation was his lawyer, and that he asked for an attorney before the interrogation began.

{14} We disagree. The record shows that the waiver form was printed in Spanish and it supports the finding that once Ramirez arrived he again read Defendant his rights and made sure that Defendant understood the waiver-of-rights form that he signed. Although Defendant claims that he did not understand the interpreter and thought that one of the officers was his attorney, the district court did not find Defendant credible. Also, insofar as Defendant insists that he explicitly asked for an attorney before the interrogation began, the district court specifically found against Defendant, based on its assessment of the conflicting evidence. The recording of the interrogation does not require us to side with Defendant on this point. As we noted at the outset, we

do not reweigh the evidence or assess credibility. Those are matters for the district court, and on appeal we view the evidence in the light most favorable to the district court's decision. *See Munoz,* 111 N.M. at 120, 802 P.2d at 25. We hold that there was sufficient evidence to support the district court's ruling that Defendant's statement was freely and voluntarily made.

■ {15} Defendant also argues that his confession should have been suppressed because he invoked his right to counsel shortly after the interrogation began but was not given an attorney. Defendant's claim that he invoked his right to counsel is based on his question "Who can help me?" The district court concluded that the credible evidence indicated that Defendant did not request the assistance of counsel during the questioning. The court also remarked from the bench that Defendant's question was ambiguous at best and could have meant a number of different things.

■ {16} The district court decided the matter correctly under our federal constitution. In *Davis v. United States,* 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), the United States Supreme Court ruled that officers need not halt the questioning of a suspect who makes an equivocal request for counsel. Indeed, the officers need not even stop to clarify what the suspect means. *See id.* at 461, 114 S.Ct. 2350. In *Davis* the defendant stated, "Maybe I should talk to a lawyer." *Id.* at 455, 114 S.Ct. 2350. But the Supreme Court ruled that the officers did not need to stop the interrogation because the statement was not a clear, unequivocal request for an attorney. *See id.* at 462, 114 S.Ct. 2350. The same can be said in this case.

{17} As the district court recognized, Defendant's question—"Who can help me?"—was ambiguous at best. While Defendant may have been asking whether he could obtain the assistance of counsel, we note that shortly thereafter he referred to the needs of his family in Mexico. He could have been asking for help with his family, for spiritual help, or moral support. Or the question could have been merely rhetorical, expressing that he was beyond help. The exchange

between Defendant and Ramirez immediately after the question would suggest that Defendant was not requesting an attorney. Under *Davis* the officers were not required to clarify Defendant's statement or halt questioning, and their failure to do so does not require the suppression of Defendant's confession under federal law.

{18} Defendant suggests that *Davis* is distinguishable because Defendant speaks only Spanish and because Ramirez thought that Defendant may have been inquiring about an attorney. To be sure, *Davis* did not involve a Spanish-speaking defendant. As this case indicates, language barriers increase the potential for ambiguity, even when a translator is used. Nevertheless, ambiguity alone will not allow Defendant to prevail under the federal standard. In *Davis* the Court acknowledged that its holding might disadvantage some suspects with limited linguistic skills, but it said that the primary protection is the *Miranda* warnings themselves. *See id.* at 460, 114 S.Ct. 2350. Moreover, the district court did not believe Defendant's claims that he had trouble understanding Ramirez and was trying to ask for an attorney. We cannot override that credibility determination on appeal.

{19} Similarly, Ramirez's doubt about whether Defendant was asking for an attorney does not distinguish this case from *Davis.* The officers in *Davis* also thought that the defendant may have been asking for counsel, and they asked clarifying questions. *See id.* at 455, 114 S.Ct. 2350. Yet, the Supreme Court ruled that those questions were unnecessary and did not affect whether the interrogation should have stopped. *See id.* at 461–62, 114 S.Ct. 2350.

■ {20} Perhaps realizing that *Davis* does not support his claim on appeal, Defendant asks this Court to apply a different standard in New Mexico based on our state constitution. We reject Defendant's request for two reasons. First, as the State's motion to strike Defendant's reply brief points out, Defendant raises his state constitutional argument for the first time in his reply brief. We will not consider arguments raised for the first time in a reply brief. *See State v.*

*Fairweather*, 116 N.M. 456, 463, 863 P.2d 1077, 1084 (1993).

■ {21} Second, the State correctly points out that Defendant did not adequately preserve a state constitutional argument below. We recognize that Defendant's written motion to suppress cites to both the federal and state constitution, but Defendant needed to do more than simply cite the state constitution to preserve a claim that it should provide greater protection than the federal constitution. *See State v. Gomez*, 1997-NMSC-006, ¶ 23, 122 N.M. 777, 932 P.2d 1 (when there is no existing precedent in New Mexico showing that our courts have applied the state constitutional provision at issue more expansively than its federal counterpart, the defendant must provide reasons in the trial court why the state constitution should be applied differently). Moreover, during the hearing on Defendant's motion to suppress, the district court indicated that it was familiar with the relevant federal law and asked Defendant's trial counsel whether the law in New Mexico was any different. Part of trial counsel's response is inaudible on the taped transcript, but the portion that is audible indicates that trial counsel believed that New Mexico would follow federal case law. In short, while New Mexico may or may not decide to follow the *Davis* rule as a matter of state constitutional law, we do not reach that question in this case because the issue was not properly preserved below or raised appropriately on appeal.

### B. The Taped Conversations

{22} Defendant also challenges the admission of two tape-recorded conversations—one between himself and Zamarron, and one between Reyes and Zamarron. Defendant claims that these recordings were inadmissible hearsay and that their admission violated his constitutional right to confront the witnesses against him. The conversation between Defendant and Zamarron occurred on December 10, 1995. Defendant and Reyes had decided to tape record a conversation between Defendant and Zamarron in an effort to have evidence implicating Zamarron in the conspiracy and to get payment from Zamarron. In the conversation Defendant repeatedly asked for payment and Zamarron explained the difficulty of getting the money. The conversation between Reyes and Zamarron took place on January 23, 1996. Reyes recorded this conversation at the suggestion of police investigators, with no involvement from Defendant. Reyes speaks of the murder by Defendant and asks Zamarron for payment.

■ {23} Defendant and the State dispute whether Defendant adequately preserved an objection to the December 10 recording. The audible portion of the record on appeal contains no objection; but because part of the discussion regarding the January tape is inaudible, we will give Defendant the benefit of the doubt on preservation. In any event, the December 10 recording was clearly admissible. Whatever Defendant said during the conversation was admissible as an admission by a party-opponent. *See* Rule 11–801(D)(2)(a) NMRA 1999. Contrary to Defendant's assertion, such admissions need not be sworn. *See id.; cf.* Rule 11–801(D)(1)(a) (prior inconsistent statement is hearsay if not sworn). Our review of the transcript of the conversation reveals that Zamarron said very little that would incriminate Defendant, but Zamarron's portion of the conversation would be admissible anyway because the conversation was "a reciprocal and integrated utterance between the two parties." *United States v. Lemonakis*, 485 F.2d 941, 948 (D.C.Cir.1973) (internal quotation marks and citation omitted). Zamarron's statements are necessary to put Defendant's statements in context. *See id.; United States v. McDowell*, 918 F.2d 1004, 1007 (1st Cir.1990); *United States v. Gutierrez–Chavez*, 842 F.2d 77, 81 (5th Cir.1988); *United States v. Stelten*, 867 F.2d 453, 454 (8th Cir.1988) (per curiam). And to the limited extent that Zamarron implicated Defendant, Defendant's failure to contradict Zamarron constituted an adoptive admission. *See* Rule 11–801(D)(2)(b); *Lemonakis*, 485 F.2d at 949; *Gutierrez–Chavez*, 842 F.2d at 81; *Stelten*, 867 F.2d at 454. As for Defendant's confrontation-clause argument, he fails to suggest how the State's use of his own admissions could violate his right to confront the witnesses against him. *See*

*Lemonakis,* 485 F.2d at 949; *Gutierrez–Chavez,* 842 F.2d at 81; *Stelten,* 867 F.2d at 454.

{24} With respect to the January recording, Defendant's contentions are much more troubling. The State argues that the conversation between Reyes and Zamarron is admissible under the co-conspirator exception to the hearsay rule. *See* Rule 11–801(D)(2)(e). But, as Defendant points out, this exception applies only to statements made during the course of and in furtherance of the conspiracy. We have great difficulty seeing how the conversation was in furtherance of the conspiracy when one party to the conversation had dropped out of the conspiracy, was cooperating with law enforcement authorities, and had initiated the conversation only to obtain incriminating evidence against the other party to the conversation.

{25} But we need not resolve that matter. Even assuming that admission of the January recording was error, the error was harmless with respect to each of the four convictions. The State certainly had no need for additional evidence of the conspiracy to commit murder. Defendant admitted the conspiracy in both his confession and his testimony at trial. With respect to the murder charge, the only issue was the extent of Defendant's involvement in the attack on the victim. He admitted at trial that he stabbed her, kicked her in the face, and left her lying motionless. In his confession he also admitted strangling her and hitting her with a rock. The only persons who could know the specific roles of Reyes and Defendant in the murder were the two perpetrators themselves. The jury could not have relied on anything Zamarron said on the recording to resolve the conflict. As for Reyes's statements in the conversation, although he implicated Defendant as the murderer in general terms, he provided no details of the assault. In our view, his statements on the recording would not have materially strengthened his live testimony at trial, at which he limited his involvement in the actual murder to dropping off Defendant at the trailer. Indeed, the jury's verdict of attempted murder, rather than murder itself, indicates that the jury credited Defendant's account at trial, rather than Reyes's. Finally, there is no discussion on the recording regarding insurance, so the recording could not have affected the fraud or conspiracy-to-commit-fraud convictions. In short, we hold that if the admission of the recording of the January conversation between Reyes and Zamarron was error, it was harmless error because there was not a "reasonable possibility that the evidence complained of might have contributed to the conviction." *State v. Torres,* 1999–NMSC–010, ¶ 52, 127 N.M. 20, 976 P.2d 20 (internal quotation and citation marks omitted).

{26} We add one comment on the harmless-error issue. The State's answer brief suggests that the admission of improper evidence is harmless error if the other evidence at trial was sufficient to sustain the conviction. This is not the first time we have seen such language. It is incorrect. Indeed, most reversible error occurs when the admissible evidence would have sufficed for conviction. The test is as stated above.

## C. Enhanced Sentence for Attempted Murder

{27} Defendant argues that the district court improperly enhanced his sentence for attempted murder. *See* NMSA 1978, § 31–18–15.1 (1993) (providing for alteration of sentence for mitigating or aggravating circumstances). The district court may enhance a sentence based on the circumstances surrounding the commission of the crime. *See State v. Fuentes,* 119 N.M. 104, 109–110, 888 P.2d 986, 991–92 (Ct.App. 1994). Defendant contends, however, that the district court should not have used as an aggravating factor the amount of time that he spent planning the murder. He argues that such use violated his right to be free from double jeopardy, because the court was in substance punishing him for having engaged in a conspiracy, a crime for which he was separately convicted. In *Swafford v. State,* 112 N.M. 3, 16, 810 P.2d 1223, 1236 (1991), our Supreme Court ruled that enhancement of a sentence is prohibited if based on "elements of either the offense for which the defendant was sentenced or a separate, but contemporaneous, conviction."

{28} In this case, although it is true that Defendant was convicted of conspiring to commit murder, the length of the conspiracy was not an element of the offense. *See* UJI 14–2810 NMRA 1999. The length of the conspiracy was simply one of the circumstances of the offense. The district court acted within its authority in relying on the long, advanced planning by Defendant as one factor in its decision to enhance his sentence for attempted murder. We also note that the court relied on a number of other factors, none challenged by Defendant, to support its decision to enhance the sentence. Accordingly, we affirm the enhancement of Defendant's sentence for attempted murder.

### D. Sentence for Conspiracy to Commit Murder

{29} Defendant's brief-in-chief challenged the district court's decision to treat Defendant's conviction for conspiracy to commit first-degree murder as a second-degree felony resulting in death. In his reply brief, however, he concedes that *State v. Shije*, 1998–NMCA–102, 125 N.M. 581, 964 P.2d 142, is dispositive of this issue. We affirm Defendant's sentence for conspiracy to commit first-degree murder.

### E. Sufficiency of the Evidence of Attempted Fraud and Conspiracy to Commit Fraud

{30} Defendant challenges the sufficiency of the evidence to support his convictions for attempted fraud and conspiracy to commit fraud. He claims that there is no evidence that he knew that Zamarron planned to pay for the murder of his wife with the proceeds from life insurance policies Zamarron had taken out on his wife's life. He admits that his tape-recorded conversation with Zamarron supplies such evidence, but he claims that the recording was inadmissible. In assessing the sufficiency of evidence at trial, however, we consider all evidence that was admitted, even if we reverse on the ground that some evidence was inadmissible. *See State v. Post*, 109 N.M. 177, 181, 783 P.2d 487, 491 (Ct.App.1989). In any event, we have already held that the recording was properly admitted at trial. Moreover, Reyes testified that Zamarron told Defendant and him before the murder that he would seek insurance proceeds for his wife's death and thereby pay the fee for the murder. Thus, there was sufficient evidence of fraud.

{31} On the other hand, we reverse Defendant's conviction for conspiracy to commit fraud. The State has failed to point to evidence that this conspiracy was distinct from the conspiracy to commit murder. There is no evidence of a separate agreement to commit fraud. Rather, the fraud was an integral part of the agreement to murder the victim for pay.

### III. CONCLUSION

{32} We reverse Defendant's judgment and sentence for conspiracy to commit fraud. In all other respects, we affirm the judgment and sentence.

{33} **IT IS SO ORDERED.**

ALARID and BOSSON, JJ., concur.

BOSSON, Judge (concurring).

{34} I agree with the opinion of the majority and its discussion of this case in light of United States Supreme Court precedent which binds this Court with respect to the federal constitution. It is unfortunate a better record was not made below on which we could consider a different standard under our state constitution. I find Justice Souter's concurrence in *Davis v. United States*, 512 U.S. 452, 466, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994), joined by three of his colleagues, more persuasive than the majority opinion in terms of obliging a reasonable, fair-minded interrogator at least to clarify whether the suspect is requesting an attorney when confronted with an ambiguous statement to that effect. To their credit, the law enforcement officials did so in *Davis*, but I am not confident the police did so in this instance. Law enforcement should do so in every case as a matter of constitutional law and common sense. Given the linguistic and cultural differences our state enjoys, not to mention our border with Mexico, our citizens should demand no less as part of intelligent, responsible law enforcement.

{35} I also note my reservation about why the *Miranda* warnings and the *Miranda* waiver form were not read to Defendant *on the record* and his consent similarly captured on the record. Far too much of what may or may not have occurred was left off the record and depended upon the officer's recollection. There is no excuse for such sloppy police practice in today's world, particularly when it was known that Defendant was coming from Mexico and in all probability spoke little or no English. Proof of Defendant's comprehension and waiver of his *Miranda* rights should have been visible, and audible, from a clear record without subjecting Defendant, and this Court, to the vicissitudes of imperfect memory, potentially colored by an overweening ambition to convict.