This decision of the New Mexico Court of Appeals was not selected for publication in the New Mexico Appellate Reports.  Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions.  Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Court of Appeals.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**No. A-1-CA-40917**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**MATTHEW FUENTEZ,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF LEA COUNTY**
**Mark Sanchez, District Court Judge**

Raúl Torrez, Attorney General
Santa Fe, NM
Eric Orona, Assistant Solicitor General
Albuquerque, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

## MEMORANDUM OPINION

**HENDERSON, Judge.**

**{1}**     Defendant Matthew Fuentez appeals his convictions for one count of second-degree murder, contrary to NMSA 1978, Section 30-2-1(B) (1994); and five counts of child abuse by endangerment (no death or great bodily harm), contrary to NMSA 1978, Section 30-6-1(D)(1) (2009). On appeal, Defendant argues that the district court erred in admitting hearsay statements and instructing the jury with UJI 14-5021 NMRA. Additionally, Defendant argues that the State presented insufficient evidence to sustain

his convictions and that his five convictions for child abuse violate principles of double jeopardy. We conclude that any error made by the district court in admitting the hearsay statements was harmless. We also conclude that three of Defendant's child abuse convictions violate his right to be free from double jeopardy. We therefore affirm in part and reverse in part.

**BACKGROUND**

**{2}**     We briefly discuss the facts that are relevant to this appeal. We provide additional facts as is necessary to our analysis of the particular issues below.

**{3}**     Defendant's convictions arise from the murder of Victim by gunfire in 2020. Defendant and Gabriela Calderon had been in a romantic relationship for nearly a decade. Several months prior to the shooting, Calderon also began a romantic relationship with Victim while still maintaining her relationship with Defendant. Calderon and Victim's relationship had caused prior arguments between Defendant, Victim, and Calderon. Tensions had escalated such that Defendant sent Calderon a photo of a gun via text message the day before the murder. Just hours prior to the shooting, Defendant sent Calderon text messages, including, "U asked for it bitch," "U will regret this I promise u karma is a bitch," and a message that Defendant is "gonna fucc yours up just u did mine" to which Calderon responded, "U can try [Victim]'s not going anywhere."

**{4}**     On the night of the murder, three of Calderon's children, her nephew (Nephew), and Victim's son were at Calderon's home while she and Victim were out. While Calderon and Victim were gone, Defendant went to the house to pick up Nephew, who was not getting along with the other children. Defendant and Nephew were sitting in Defendant's truck near the end of the driveway when Calderon and Victim returned. Defendant and Victim began yelling at each other as Victim stepped out of his car. Subsequently, six gunshots were fired and Victim was killed from a single gunshot wound. Nearby home surveillance footage captured the sound of the gunshots and Defendant's truck running a stop sign as he drove away from Calderon's home with Nephew immediately after the shooting. Calderon placed a 911 call shortly after the shooting stating the shooter had just left, and then soon after texted a friend stating specifically that Defendant shot Victim.

**{5}**     Law enforcement arrived at Calderon's home shortly after the shooting to investigate the incident. Calderon spoke with law enforcement at the scene and her conversations with Officer Cabello and Chief Miranda were recorded on police lapel body cameras. These lapel videos are the subject of Defendant's hearsay argument on appeal, and we describe them in more detail in our discussion of that argument. While processing the scene, law enforcement found three .40 caliber bullet shell casings in the street. No firearm was ever recovered.

**{6}**     Defendant was later arrested and charged with several offenses, including one count of first-degree murder; five counts of child abuse by endangerment; one count of shooting at or from a motor vehicle (great bodily harm), contrary to NMSA 1978, Section

30-3-8(B) (1993); and one count of possession of a firearm by a felon, contrary to NMSA 1978, Section 30-7-16(D)(3) (2020, amended 2022). Following a jury trial, Defendant was convicted of one count of second-degree murder and five counts of child abuse by endangerment. Defendant appeals.

**DISCUSSION**

**{7}** On appeal, Defendant argues that (1) the district court erred in admitting Calderon's out-of-court hearsay statements; (2) the district court committed fundamental error in instructing the jury with UJI 14-5021; (3) his five child abuse convictions result in double jeopardy; and (4) the State failed to present sufficient evidence to support his second-degree murder and five child abuse convictions. We address each issue in turn.

**I.     Admission of the Lapel Videos**

**{8}** First, Defendant contests the admission of lapel video footage of Calderon's interviews with two law enforcement officers on the night of the shooting. Specifically, Defendant argues that Calderon's statements in the videos constitute inadmissible hearsay and that they were not properly admitted as recorded recollections.[1]

**{9}** On the first day of trial, the State moved to introduce the lapel video footage of Calderon's interviews with Officer Cabello and Chief Miranda as Calderon's recorded recollections. The State first moved to admit Officer Cabello's lapel video footage through Officer Cabello. Over Defendant's hearsay objection, the district court recognized the State had partially laid the foundation that would warrant admission of the video and conditionally admitted the video, subject to the State overcoming Defendant's hearsay objections later in the trial. In laying a foundation for the admission of the lapel video footage of Chief Miranda's interview with Calderon, the State then called Officer Dowell to testify. Officer Dowell testified as to the authenticity of her lapel video footage taken of Chief Miranda's interview with Calderon. The State moved to enter the video into evidence. Over Defendant's hearsay objection and after a brief bench conference, the district court again conditionally admitted the video subject to the State overcoming Defendant's hearsay objections.

---

[1]Defendant also asserts that the State's primary purpose in calling Calderon to testify was to "back-door" her otherwise inadmissible prior statements under the auspices of impeachment. However, our review of Calderon's testimony reveals she provided both favorable and unfavorable substantive evidence material to the State's prosecution. *See State v. Lopez,* 2011-NMSC-035, ¶¶ 17-18, 150 N.M. 179, 258 P.3d 458 (determining whether "a witness's testimony has a proper primary purpose" by "scrutiniz[ing] the content of the witness's testimony to ascertain whether it contains evidence that is both favorable and unfavorable to the proponent"). As to the former, Calderon testified that she was in a relationship with Defendant while in a relationship with Victim, and that both Defendant and Victim knew this. Calderon also testified that she and Defendant were arguing the day of the shooting and that Defendant did not like her being with Victim. As to the latter, Calderon denied that Defendant was the shooter or that she ever saw him with a gun. Therefore, Defendant has not demonstrated improper motive on the part of the State in calling Calderon as a witness and we decline to further address this issue.

**{10}**    The next day, the State called Calderon to testify and, as foundation for admitting Officer Cabello's lapel video footage, Calderon confirmed that she remembered talking to police on the night of the murder and that she would have told them the truth. The State then asked, "Do you remember telling the police that, [Defendant], your baby daddy, came to the house?" Defendant immediately objected, and after a brief bench conference during which Defendant expressed concern about the appropriate method for refreshing the witness's recollection, the State attempted to refresh Calderon's memory with a police report. Calderon then testified she "didn't remember" when asked if the police report refreshed her memory. After another bench conference, and over Defendant's continuing hearsay objection, the district court granted the State's request to play Officer Cabello's lapel video footage for the jury. Immediately prior to publishing the entirety of Officer Cabello's three-and-a-half minute lapel video for the jury, the State displayed a still frame of Calderon from the video and Calderon confirmed the still frame was an image of her on the night of the shooting. The footage reflects Calderon telling Officer Cabello that Defendant may have been responsible for the shooting. Calderon can be heard telling Officer Cabello several times that Defendant shot at Victim, but each time she qualifies her answer to say that Defendant was in the driver's seat of his truck and that someone shot Victim from his car, but she is not sure who. After the video was played, the State moved to admit the video into evidence as an exhibit. Defendant again objected, arguing that the video could only be admitted as an exhibit if offered by the adverse party. The State countered that it had moved to admit the exhibit under Officer Cabello and had now overcome Defendant's hearsay objections because Calderon had adopted her statements in the video. The district court admitted Officer Cabello's lapel video footage as an exhibit.

**{11}**    As the State's direct examination of Calderon continued, the State replayed a portion of the 911 call made immediately after the shooting. The 911 call had previously been admitted and played for the jury on the first day of trial through the county records manager, over Defendant's hearsay objections. On the call, Calderon tells the 911 dispatcher that the Victim had been shot, the dispatcher asks where the shooter is, and Calderon responds, "he just left!" After the call was played, Calderon testified that although she was present when Defendant picked up Nephew that night, she did not know what happened or who "he" was that "just left."

**{12}**    Calderon then testified that she did not remember which police officers she spoke with that night and denied speaking to Chief Miranda, but reiterated that she spoke with multiple officers that night and that she would have been truthful. During another brief bench conference, the State moved to admit Officer Dowell's lapel video footage and play it for the jury. Over Defendant's objection and the district court's own concern about the State "back-dooring hearsay like this," the court admitted the video. However, prior to playing Officer Dowell's lapel video footage the district court recessed briefly, and outside the presence of the jury, the district court allowed Defendant further argument on his continuing objections to the admission of both videos. Following Defendant's argument, the district court again confirmed that it was admitting the videos. The State proceeded to play Officer Dowell's six minute lapel video of Chief Miranda's interview with Calderon, after Calderon again identified herself in a still frame

from the video. The video was then admitted into evidence as an exhibit. The lapel video footage captures Calderon's statements made to Chief Miranda at the scene the night of the shooting, including that Defendant started shooting when Victim got out of his car. Calderon also stated that "just the kids" were present and that "they didn't even make it inside before he even started shooting."

**{13}**     Defendant objected to the admission of the lapel video footage containing Calderon's statements as hearsay. *See* Rule 11-801(C) NMRA. The State does not deny that the videos contain hearsay. Instead, it argues that the videos were admissible as a recorded recollection under Rule 11-803(5) NMRA because (1) Calderon testified that she could not remember what happened after Defendant picked up Nephew at her house, whether anyone other than her children were at the house, or whether she even saw Defendant that night; (2) "the video is a time capsule of . . . Calderon's memory at the time [of the shooting and therefore] the interview accurately displayed her knowledge of the events"; and (3) Calderon testified that she spoke to police on the night of the shooting and would have told them the truth. The district court admitted the statements in the lapel videos as Calderon's recorded recollection. The court reasoned that Calderon could not remember the shooter's identification, and that because she had adopted certain statements made in the 911 call from the night of the shooting, Calderon was only "a baby step away" from adopting the statements in the videos as accurate reflections of her knowledge on the day of the murder.

**{14}**     "We review the admission of evidence under an abuse of discretion standard and will not reverse in the absence of a clear abuse." *State v. Sarracino*, 1998-NMSC-022, ¶ 20, 125 N.M. 511, 964 P.2d 72. "An abuse of discretion occurs when the ruling is clearly against the logic and effect of the facts and circumstances of the case. We cannot say the [district] court abused its discretion by its ruling unless we can characterize [the ruling] as clearly untenable or not justified by reason." *State v. Rojo*, 1999-NMSC-001, ¶ 41, 126 N.M. 438, 971 P.2d 829 (internal quotation marks and citation omitted). We will find an abuse of discretion when the "[district] court's decision was obviously erroneous, arbitrary or unwarranted." *State v. Trujillo*, 2002-NMSC-005, ¶ 15, 131 N.M. 709, 42 P.3d 814 (internal quotation marks and citation omitted).

**{15}**     Moreover, we review preserved, non-constitutional evidentiary errors for harmless error. *See State v. Serna*, 2013-NMSC-033, ¶ 23, 305 P.3d 936. "[N]on-constitutional error is harmless when there is no reasonable probability the error affected the verdict." *State v. Tollardo*, 2012-NMSC-008, ¶ 36, 275 P.3d 110 (emphasis, internal quotation marks, and citation omitted). "Improperly admitted evidence is not grounds for a new trial unless the error is determined to be harmful." *Id.* ¶ 25. "[I]n reaching a judgment as to the likely effect of the error, courts should evaluate all of the circumstances surrounding the error." *Id.* ¶ 43. "This includes the source of the error, the emphasis placed on the error, evidence of the defendant's guilt apart from the error, the importance of the erroneously admitted evidence to the prosecution's case, and whether the erroneously admitted evidence was merely cumulative." *Serna*, 2013-NMSC-033, ¶ 23.

**{16}** Under Rule 11-803(5), a recorded recollection is "[a] record that"

    (a)    is on a matter the witness once knew about but now cannot recall well enough to testify fully and accurately,

    (b)    was made or adopted by the witness when the matter was fresh in the witness's memory, and

    (c)    accurately reflects the witness's knowledge.

    If admitted, the record may be read into evidence but may be received as an exhibit only if offered by an adverse party.

Thus, to be admitted as a recorded recollection, a witness must testify that they made or adopted the recording and that the recording accurately reflects their knowledge. *See, e.g.*, *State v. Padilla*, 1994-NMCA-067, ¶ 34, 118 N.M. 189, 879 P.2d 1208 (affirming the introduction of evidence as a recorded recollection when one witness "testified that what she told the deputies was correct" and another witness "testified that whatever her prior statement said regarding the color of the robber's jacket, that was correct"); *State v. Macias*, 2009-NMSC-028, ¶ 34, 146 N.M. 378, 210 P.3d 804 (concluding that a phone call transcript was not admissible as a recorded recollection because neither witness testified to having made or adopted the recordings, nor that the recordings accurately reflected their knowledge), *overruled on other grounds by Tollardo*, 2012-NMSC-008, ¶ 37 n.6. And, while the proponent may play the recording for the jury if all of the foundational requirements are met, the proponent *cannot* enter it into evidence to ensure the fact-finder does not give the recording undue prominence compared to other testimony. *See State v. Ross*, 1973-NMCA-072, ¶ 11, 85 N.M. 176, 510 P.2d 109 (holding the district court's "discretion was abused because of the prejudice to [the] defendant in giving undue prominence to the oral testimony which had been recorded, when there was other and conflicting oral testimony").

**{17}** Even assuming without deciding that the lapel videos were erroneously admitted under Rule 11-803(5) and that the district court erred in receiving the videos as exhibits when offered by the State as the proponent of the evidence, we conclude that any error was harmless and explain.

**{18}** While indeed the State relied on the erroneously admitted lapel videos, the State also relied on multiple other pieces of substantive evidence to prove Defendant's guilt. This included the 911 call Calderon made immediately after the shooting in which she proclaims the shooter just left the scene and her son tells the operator that "[Defendant] just came to pick up [Nephew], I didn't know this was going to happen," the bullet casings recovered from the street in front of Calderon's home, and nearby home surveillance footage in which Defendant's truck is the only vehicle seen speeding away from the scene after the sound of gunshots are heard. The State also called a detective who interviewed Defendant, and a recording of that interview was published for the jury. During that interview, the detective played the home surveillance footage while

describing the bullet casings as being fired from a vehicle while driving away from the scene to Defendant, who confirmed that he got into an argument with Victim at Calderon's home shortly before shots were fired and that only Defendant and Nephew were in his truck at the time of the shooting. The State also introduced Calderon's testimony and the text messages she received from Defendant leading up to the shooting, which included the photo of a gun, that helped establish Defendant's motive—his discontent with Calderon being in a relationship with Victim while also in a relationship with him. Finally, the admission of Calderon's text message to a friend explicitly identifying Defendant as the shooter less than an hour after the shooting greatly reduced the significance of the videos to the State's case. The text message is cumulative of the videos as statements of an eyewitness identifying Defendant as the shooter soon after the shooting.

**{19}** Importantly, although the State made multiple references to Calderon's statements in the lapel videos during closing and rebuttal, and the jury viewed Officer Cabello's lapel video footage during deliberations, the State also directed the jury's attention to other evidence, and the jury asked to review other evidence during its deliberations. The State read Calderon's text message to her friend specifically identifying Defendant as the shooter. The State also directed the jury's attention to the gun photo texted from Defendant to Calderon and Defendant's threatening text messages to Calderon—including that Calderon "asked for it, bitch," and that she "will regret this. I promise you, karma is a bitch." The State reiterated Defendant's motive being the love triangle and Calderon's testimony describing events leading to the shooting. The State directed the jury's attention to the home surveillance footage, and played the footage a second time for the jury before playing the 911 call again for the jury. The State then argued the importance of Calderon still being in a relationship with Defendant in weighing her testimony. The defense largely focused on the lack of physical evidence during its closing, but directed the jury to the videos at issue to briefly argue that Calderon equivocated when identifying the shooter in the videos. Finally, during deliberations the jury also requested and viewed Defendant's nineteen-minute interview with the detective, the text messages Defendant sent to Calderon just prior to the shooting, and Calderon's text message to her friend identifying Defendant as the shooter.

**{20}** The State presented an abundance of substantive evidence apart from the lapel videos that established Defendant's guilt. *See Tollardo*, 2012-NMSC-008, ¶ 43 (explaining that although other evidence of a defendant's guilt can never be the singular focus of harmless error analysis, it is often relevant to help us understand what role the error may have played in the trial proceedings). Critically, the videos of Calderon's identification of Defendant as the shooter were cumulative of a text message she sent shortly thereafter also identifying Defendant as the shooter. *See State v. Johnson*, 2004-NMSC-029, ¶¶ 38-40, 136 N.M. 348, 98 P.3d 998 (discussing cumulative evidence in the context of harmless error analysis and stating that "[t]he probative force—and therefore the possible prejudicial effect—of a particular piece of evidence tends to decrease the more redundant that evidence is in the context of other similar evidence"). Moreover, the State relied upon and the jury inquired about the many other

substantive pieces of evidence that establish Defendant's guilt. In light of the circumstances, we conclude that any error in admitting the videos was harmless. As such, we affirm.

## II.    Jury Instruction Error

**{21}**    Defendant next argues the district court committed fundamental error in instructing the jury with UJI 14-5021. In support, Defendant contends that (1) the UJI use note indicates that the instruction is not to be given; and (2) that instructing the jury with both UJI 14-5021 and UJI 14-5020 NMRA resulted in contradictory instructions amounting to fundamental error. "The standard of review we apply to jury instructions depends on whether the issue has been preserved. If the error has been preserved we review the instructions for reversible error. If not, we review for fundamental error. Under both standards we seek to determine whether a reasonable juror would have been confused or misdirected by the jury instruction." *State v. Benally*, 2001-NMSC-033, ¶ 12, 131 N.M. 258, 34 P.3d 1134 (internal quotation marks and citations omitted). Here, Defendant did not preserve his objection to the given jury instructions and our review is accordingly for fundamental error.

**{22}**    At trial, the district court instructed the jury with both UJI 14-5020 and 14-5021. The former tracks the language of UJI 14-5020 and states:

> You alone are the judges of the credibility of the witnesses and the weight to be given to the testimony of each of them. In determining the credit to be given any witness, you should take into account the witness's truthfulness or untruthfulness, ability and opportunity to observe, memory, manner while testifying, any interest, bias or prejudice the witness may have and the reasonableness of the witness's testimony, considered in the light of all the evidence in the case.

The latter tracks the language of UJI 14-5021 and states:

> In determining the credibility of a witness you may consider any matter that has a tendency in reason to prove or disprove the truthfulness of [their] testimony, including a statement made by [the witness] that is inconsistent with any part of his testimony.

**{23}**    Our Supreme Court has held that UJI 14-5020 "is a sufficient instruction to alert the jury to its responsibility to evaluate witness testimony." *Sarracino*, 1998-NMSC-022, ¶ 9. The UJI 15-5021 use note indicates that "[n]o instruction on this subject shall be given." Additionally, the committee commentary states that "[t]he [c]ommittee believed that UJI 14-5020 generally covers this subject matter and no separate instruction should be given."

**{24}**    In instructing the jury with UJI 15-5021, the district court failed to follow existing law and practice. *See Delfino v. Griffo*, 2011-NMSC-015, ¶ 19, 150 N.M. 97, 257 P.3d

917 ("Use notes, though not part of the statute or jury instruction, are adopted by [our Supreme] Court and binding on district courts."). As such, the district court erred by giving UJI 15-5021 to the jury, but this error was not fundamental.

**{25}** Rather than being contradictory instructions as Defendant asserts, the committee commentary notes that UJI 15-5021 should not be given because it is redundant to UJI 14-5020 in alerting the jury of its responsibility in weighing witness credibility. *See* UJI 14-5020 comm. cmt. Thus, Defendant has not demonstrated that the instruction was confusing or misleading such that the giving of an erroneous jury instruction amounts to fundamental error.

### III.    Double Jeopardy

**{26}** Next, Defendant asserts that his five convictions for child abuse by endangerment violate principles of double jeopardy under a unit of prosecution theory. The State counters that Defendant's conduct in firing six gunshots, with only one shot striking Victim, were separate acts with sufficient indicia of distinctiveness to warrant five separate convictions. In part, we agree with Defendant.

**{27}** "The Double Jeopardy Clause of the Fifth Amendment, enforced against the states by the Fourteenth Amendment, protects defendants from receiving multiple punishments for the same offense." *State v. DeGraff*, 2006-NMSC-011, ¶ 25, 139 N.M. 211, 131 P.3d 61 (internal quotation marks and citation omitted). "The defense of double jeopardy may not be waived and may be raised by the accused at any stage of a criminal prosecution, either before or after judgment." NMSA 1978, § 30-1-10 (1963). Claimed violations of the protection against double jeopardy are questions of law, which require de novo review. *See State v. Contreras*, 2007-NMCA-045, ¶ 18, 141 N.M. 434, 156 P.3d 725.

**{28}** In unit of prosecution double jeopardy cases, "a defendant challenges multiple convictions under the same statute." *State v. Swick*, 2012-NMSC-018, ¶ 10, 279 P.3d 747. In such cases, we apply the two-step test articulated in *Swafford v. State*. 1991-NMSC-043, 112 N.M. 3, 810 P.2d 1223. The relevant inquiry is "whether the [L]egislature intended punishment for the entire course of conduct or for each discrete act." *Id.* ¶ 8. "First, we review the statutory language for guidance on the unit of prosecution." *State v. Bernal*, 2006-NMSC-050, ¶ 14, 140 N.M. 644, 146 P.3d 289. "If the language is not clear, then we move to the second step, in which we determine whether a defendant's acts are separated by sufficient indicia of distinctness to justify multiple punishments under the same statute." *Id.* (internal quotation marks and citation omitted). "If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the [L]egislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes." *Id.*

**{29}** In this case, Defendant was convicted of five counts of child abuse by endangerment in violation of Section 30-6-1(D)(1). Under Section 30-6-1(D)(1), "[a]buse of a child consists of a person knowingly, intentionally or negligently, and without

justifiable cause, causing or permitting a child to be . . . placed in a situation that may endanger the child's life or health." Our Supreme Court has concluded that this statute's language is ambiguous as to the unit of prosecution because there are two equally plausible interpretations: "either by conduct or by outcome." *State v. Ramirez*, 2018-NMSC-003, ¶ 55, 409 P.3d 902. We turn to the second prong of the analysis.

**{30}** Under the second step of the unit of prosecution analysis, "[o]ur case law instructs that we consider the temporal proximity of the acts, the location of the victim(s) during each act, the existence of an intervening event, the sequencing of acts, the defendant's intent as evinced by [their] conduct and utterances, and the number of victims." *Id.* ¶ 56. The number of victims is particularly significant to our analysis. *See Herron v. State*, 1991-NMSC-012, ¶ 15, 111 N.M. 357, 805 P.2d 624 ("[M]ultiple victims will likely give rise to multiple offenses."). As this Court explained in *State v. Castañeda*,

> [w]e further emphasize that a single unit of prosecution in a child abuse case involving multiple victims is only appropriate where the children have not actually been harmed. Pursuant to the statute, a person may be guilty of child abuse even if the child is not actually harmed. If actual harm results from child abuse, however, the focus shifts from the actions of the abuser to the result of those actions, and each child harmed is a distinct victim with unique injuries. Under such circumstances, it is entirely appropriate to charge the perpetrator with a separate count of child abuse for each victim.

2001-NMCA-052, ¶ 15, 130 N.M. 679, 30 P.3d 368 (citation omitted).

**{31}** By way of example, in *Ramirez*, our Supreme Court held that three convictions for child abuse by endangerment did not violate double jeopardy. 2018-NMSC-003, ¶ 58. The three child victims testified at trial that they were scared when the defendant shot into the vehicle they were sitting in and killed a passenger. *Id.* The Court reasoned that, "[i]n the circumstances of this case in which each of the three children separately testified to the fear and shock they respectively suffered as a result of [the defendant]'s wanton conduct, we hold that the Legislature intended prosecution for three counts of child abuse by endangerment." *Id.* ¶ 58. Therefore, the defendant's three convictions did not violate double jeopardy.

**{32}** In this case, when Defendant shot at Victim, Nephew was actually harmed and the other children were put in harm's way. Nephew testified to being in Defendant's truck and to being "scared" after Defendant told him to "duck down" as shots rang out. Thus, Nephew is a distinct victim and prosecution for a separate child abuse by endangerment charge as to his harm was proper.

**{33}** As to the children "in the yard," Defendant fired six gunshots at Victim in the driveway—four fired in rapid succession with the other two shots fired within three seconds. With each shot fired, the risk of physical harm to each of the children in the yard increased. *See id.* ¶ 57 ("The chance that any one of the children might have been

struck by one of the bullets fired into and through [victim] increased as the number of shots fired increased"). However, all shots were fired within mere seconds, there is no evidence more than a single weapon was used or that Defendant's objective in shooting Victim ever changed, and there were no intervening events. *See Bernal*, 2006-NMSC-050, ¶ 14 ("If the acts are not sufficiently distinct, then the rule of lenity mandates an interpretation that the legislature did not intend multiple punishments, and a defendant cannot be punished for multiple crimes."). None of the children in the yard testified at trial nor was there any evidence offered of physical, emotional, or psychological harm to them. In fact, Calderon testified the children were never at risk or in danger during the shooting. Defendant's actions recklessly placed the children "in the yard" in a situation that endangered their health and safety, but there was no evidence presented in the trial below to show Defendant's actions caused them harm, justifying a single punishment. *See Castañeda*, 2001-NMCA-052, ¶ 15. Consequently, we conclude that Defendant's convictions for five counts of child abuse by endangerment violate double jeopardy where the Legislature intended only two punishments in this case—one for the children in the yard, and one for Nephew.

## IV.    Sufficiency of the Evidence

**{34}**    Defendant also challenges the sufficiency of evidence to support his second-degree murder and child abuse by endangerment convictions. "The test for sufficiency of the evidence is whether substantial evidence of either a direct or circumstantial nature exists to support a verdict of guilty beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Samora*, 2016-NMSC-031, ¶ 34, 387 P.3d 230 (internal quotation marks and citation omitted). "[W]e view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *Id.* (internal quotation marks and citation omitted). In assessing the sufficiency of evidence, we consider *all* evidence admitted "even if we reverse on the ground that some evidence was inadmissible." *State v. Castillo-Sanchez*, 1999-NMCA-085, ¶ 30, 127 N.M. 540, 984 P.2d 787. "The jury instructions become the law of the case against which the sufficiency of the evidence is to be measured." *State v. Holt*, 2016-NMSC-011, ¶ 20, 368 P.3d 409 (alterations, internal quotation marks, and citation omitted).

**{35}**    We address Defendant's convictions in turn.

## A.    Second-Degree Murder

**{36}**    We first address Defendants sufficiency of evidence challenge related to his second-degree murder conviction.

**{37}**    In order to convict Defendant of second-degree murder, the jury was required to prove beyond a reasonable doubt that:

1.    Defendant killed [Victim];

2.     Defendant knew that his acts created a strong probability of death or great bodily harm to [Victim];

3.     This happened in New Mexico on or about the 13th day of August, 2020.

**{38}**    Despite a lack of physical or forensic evidence, the State presented substantial circumstantial evidence that Defendant killed Victim. Defendant and Victim had a history of hostility toward each other because Defendant did not want Calderon and Victim to be in a relationship. The day before the shooting, Defendant sent a picture of a gun to Calderon. On the day of the shooting, Calderon and Defendant were arguing about her relationship with Victim, and Defendant sent Calderon threatening text messages. In front of Calderon's house, Defendant and Victim got into a shouting match as Victim stepped out of his vehicle and shots were fired. Calderon's statements from the lapel videos identify Defendant as a possible shooter. And, when asked by the 911 operator who the shooter was Calderon replied, "he just left!" The State also presented surveillance camera footage from a nearby home showing Defendant's truck running a stop sign at the intersection shortly after the shots were fired. Finally, approximately forty-two minutes after the shooting Calderon texted a friend, "B [Defendant] shot [Victim] . . . ." Viewed in the light most favorable to the verdict, a reasonable juror could conclude from this evidence that Defendant shot Victim. The State presented substantial circumstantial evidence to support the verdict.

## B.    Child Abuse by Endangerment

**{39}**    Finally, we address Defendant's sufficiency of evidence challenge related to the child abuse by endangerment convictions. Having determined that only two counts of child abuse by endangerment are proper as the case was tried below, we assess the sufficiency of evidence supporting those convictions. Defendant claims the State failed to present sufficient evidence to prove whether any child was in the zone of danger. We disagree.

**{40}**    The State had to prove "Defendant fired a firearm from a motor vehicle with the minor child *in the car*" for one count and "*in the yard*" for the other. The State also had to prove Defendant "caused or permitted [minor child] to be placed in a situation that endangered the life or health of [minor child]" and Defendant "showed a reckless disregard for the safety or health of [minor child]," meaning the jury had to "find that . . . [D]efendant caused or permitted a substantial and unjustifiable risk of serious harm to the safety or health of [minor child]." Defendant concedes that our Supreme Court has found that shooting in a direction that puts a child in the line of fire is sufficient to prove child abuse by endangerment. *See State v. McGruder*, 1997-NMSC-023, ¶ 38, 123 N.M. 302, 940 P.2d 150 (holding that sufficient evidence of endangerment existed where the defendant fatally shot mother's boyfriend before pointing a gun at child's mother, who was standing in front of her child), *abrogated on other grounds by State v. Chavez*, 2009-NMSC-035, 146 N.M. 434, 211 P.3d 891. However, Defendant argues

the State failed to prove children were "in the yard" and that, regardless, none of the children were within the zone of danger.

{41}     Nephew testified that while sitting in Defendant's truck, Defendant pushed Nephew down and told him to "duck down" as shots were fired. Nephew testified to being "scared." Defendant told a detective that no one but he and Nephew were in the truck. This, along with the evidence as we previously stated it above, places Nephew in Defendant's truck at the time of the shooting. The jury instructions defined "in the car" as the zone of danger, and a reasonable juror could readily conclude Nephew was exposed to a significant risk of harm from his proximity to the gunshots; therefore, there is sufficient evidence to support the child abuse count related to the child "in the car."

{42}     With regard to the children "in the yard," the State's evidence came from the testimony and prior statements of two witnesses and Defendant. First, Calderon testified that "some of [the children] were outside and some of them were inside" when she and Victim first returned to the house. Calderon's statement to an officer on the night of the shooting placed the minor children "right here [in the driveway] playing basketball" when the shooting started. Later that night, she told a detective that the children had been told to go inside but did not make it in before the shooting started. Second, Nephew testified that when he got in Defendant's truck, the other kids were outside but went inside after talking to Defendant at the window of his truck. Finally, while Defendant maintained he did not fire the shots, he told a detective that he was "pissed off" his kids had to witness "a guy die in the front yard" and that "my kids are in that house, up there in the yard." Resolving the evidence in favor of the verdicts, a reasonable juror could infer that children were in the yard at the time of the shooting. Moreover, by being outside and in the front yard of Calderon's home, which was immediately adjacent to the driveway where the shooting occurred, the children were necessarily in the zone of danger as defined by the jury instruction ("in the yard"). Therefore, the State presented sufficient evidence to support the two remaining child abuse convictions.

**CONCLUSION**

{43}     For the foregoing reasons, we reverse and remand this case to the district court with instructions to enter an amended judgment and sentence consistent with this opinion. We affirm the district court in all other respects.

{44}     **IT IS SO ORDERED.**

**SHAMMARA H. HENDERSON, Judge**

**WE CONCUR:**

**J. MILES HANISEE, Judge**

**ZACHARY A. IVES, Judge**